2019 IL App (2d) 190628-U
No. 2-19-0628
Order filed December 12, 2019

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF KIMBERLY M. GMYTRASIEWICZ, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Petitioner-Appellee, | ) ) | |
| and | ) ) | No. 18-D-475 |
| PIOTR J. GMYTRASIEWICZ, | ) ) ) | Honorable D. Christopher Lombardo, |
| Respondent-Appellant. | ) | Judge, Presiding. |

JUSTICE BRIDGES delivered the judgment of the court.
Presiding Justice Birkett and Justice Burke concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court did not restrict respondent's parenting time, and it did not err in allocating parental time or in requiring respondent to wear an alcohol monitoring bracelet for a specified period. Therefore, we affirmed.

¶ 2    Respondent, Piotr J. Gmytrasiewicz, and petitioner, Kimberly M. Gmytrasiewicz, were married in 2014. Their son, Gabriel, was born in November 2016. The parties' marriage was dissolved on June 20, 2019. Respondent appeals *pro se* from the trial court's final allocation judgment and parenting plan. He argues that the trial court erred in: (1) restricting his parenting time to one overnight per week, on average, without finding that exercising his parenting time

would seriously endanger Gabriel's physical, mental, moral, or emotional health; (2) allocating a disproportionate share of parenting time to petitioner; and (3) requiring him to pay for and wear a "SCRAM" alcohol monitoring bracelet for one year after the entry of the final judgment, without finding that he did or could seriously endanger Gabriel's health. We affirm.

¶ 3                              I. BACKGROUND

¶ 4      Petitioner filed a petition for dissolution of marriage on March 20, 2018. Respondent represented himself *pro se* throughout the proceedings. On May 31, 2018, the trial court entered an order appointing Marjorie Sher as Gabriel's guardian *ad litem* (GAL). She wrote an interim report dated August 7, 2018, an amended interim report dated October 20, 2018, an interim report dated February 7, 2019, and a supplement to that report dated April 3, 2019.

¶ 5      On June 13, 2018, the trial court entered an order giving respondent unsupervised parenting time every Tuesday, Thursday, and Sunday from 3:30 p.m. to 6:30 p.m. The parties were ordered not to consume alcohol during their parenting time, and to submit to an alcohol evaluation by David Gates. On July 10, 2018, respondent's parenting time was expanded to include Mondays from 3:30 to 6:30 p.m.

¶ 6      On August 29, 2018, the trial court entered a temporary parenting agreement that was based on the GAL's recommendations. It provided respondent with parenting time every Tuesday, Thursday, and Sunday from 9:30 a.m. to 6:30 p.m. It required, among other things, that respondent: complete a program with a certified alcohol treatment provider; not consume alcohol during or for 12 hours before his parenting time with Gabriel; use SCRAM to ensure this requirement was satisfied; and obtain anger management counseling. Some requirements for petitioner were that she: not consume alcohol, continue to attend Alcoholics Anonymous (AA) on a regular basis;

continue to meet with her therapist and psychiatrist on a regular basis; and use SCRAM to ensure that she was not consuming alcohol.

¶ 7    On October 11, 2018, respondent tested positive for alcohol through SCRAM, with a "BrAC" of 0.02. Therefore, on October 16, 2018, respondent's parenting time was reduced to Tuesday, Thursday, and Sunday from 3:30 p.m. to 6:30 p.m.

¶ 8    A trial took place on various days from April to May 2019. Calvin Gmytrasiewicz, respondent's son from his first marriage, testified as a witness for petitioner, as follows. Calvin's parents divorced when he was about eight years old; he was currently 27 years old. One day when Calvin was about 14 years old, he was staying with respondent and working on math. Calvin had difficulty understanding the concepts, and respondent tugged on his ear throughout the day, pulling harder and harder, to the point that there was blood behind one ear. The Department of Children and Family Services (DCFS) subsequently investigated the incident and found abuse. As a result, respondent's visitation with Calvin was suspended and then supervised until Calvin was about 16 or 17 years old.

¶ 9    Calvin had twin half-sisters, Georgia and Sophia, from respondent's second marriage, and he visited them regularly. In late 2017 or early 2018, Calvin was visiting Georgia at respondent's house and thought that something was wrong because Georgia did not run up to greet him. Respondent said that he had gotten mad and spanked Georgia when she threw out soup that she did not want to eat because she was vegetarian. Many months later, Georgia told him a different explanation in a phone call, and Calvin was concerned that respondent was being abusive. Calvin relayed this information to the GAL.

¶ 10    Calvin was also concerned about respondent's ability to manage his anger. Respondent was a late riser, and when he had a hangover in the morning from drinking the night before, his anger

was far worse, and he wanted things done a certain way. Respondent denied having an alcohol problem to Calvin. Calvin had seen respondent lose his temper with Calvin's mother, and he struck her one time.

¶ 11    On cross-examination, Calvin admitted that his mother took photographs of his ears hours after the incident, and his ears did not have any lacerations, nor was there any blood visible. Calvin had been studying math for his high school entrance exam at the time. When asked if Calvin had raised his voice, Calvin said he did so "possibly once." Respondent repeatedly told him to please concentrate on the math book. He gave him example problems to do before going back to the original problems. Calvin agreed that he did not see respondent strike his mother. Rather, he saw respondent's foot sticking out and his mother falling onto the couch. Calvin agreed that in order to teach morning classes, respondent had to get up around 7 a.m. Calvin was not aware whether respondent sometimes read in bed after waking up in the morning.

¶ 12    In the past 10 years, Calvin had come to respondent's house to hang out about every other weekend. Calvin had never seen respondent get physical with Gabriel or yell at him. Respondent had gotten "a little frustrated" when Gabriel was crying a lot. It was "[n]atural impatience" with a crying baby. Calvin had never seen respondent drink alcohol when Gabriel was awake. Respondent had taken Calvin, Georgia, and Sophia to Hawaii in 2014 for about 10 days, and Calvin did not recall respondent yelling at anyone during that time. He also did not see respondent drinking alcohol in the presence of Georgia and Sophia. However, he saw him hung over one morning. They had also traveled to Wisconsin Dells several times over the years, and Calvin did not see respondent hitting anyone or swearing. Calvin had seen respondent spank Sophia once "a very long time ago" when she did not want to go to bed.

¶ 13    Sher, the GAL, provided the following testimony. The trial court's August 29, 2018, order regarding parenting time incorporated some of Sher's recommendations based on her investigations, including third-party evaluations of petitioner and respondent. One requirement was that respondent not consume alcohol during his parenting time or for 12 hours prior. Sher received a letter from SCRAM stating that respondent's breath test on October 11, 2018, showed a result of 0.02. This was a violation of the alcohol restriction in the trial court's order. Sher spoke with respondent on October 12, 2018. He said that he was drinking with his friend until 10:30 or 11 p.m. the night before the test, which was within the 12-hour period that he was not supposed to be consuming alcohol. Respondent initially agreed to forfeit his parenting time with Gabriel that day, but he later sent an e-mail saying that he did not agree to forfeit the parenting time. He also sent an e-mail saying that he did not realize that he was supposed to take a second SCRAM test on October 11, 2018, due to the positive test result. Respondent sent another e-mail on October 13, 2018, which stated that he had just done a scheduled blow into SCRAM after using mouthwash, and SCRAM had ordered a retest. He stated that it confirmed his suspicion that his prior positive result was due to mouthwash. It appeared to Sher that respondent was trying to change his story about the first positive result by attributing it to mouthwash, whereas he had already admitted to her that he had been drinking the night before the test. The trial court subsequently reduced respondent's parenting time.

¶ 14    In Sher's interim report dated October 30, 2018, she stated that respondent admitted drinking every night before he had a day off, after his daughter went to bed, from 9 or 9:30 p.m. until 11:30 p.m. or midnight. Respondent's first and second wives said that he would drink every night to the point of intoxication and get up and urinate in various places in the house. They both said that he would strictly enforce bedtime for the children so that he could start drinking after the

children went to sleep. One of the three wives had said that respondent once left a flame on the stove at night. Sher was concerned about the flame as a safety issue, and she was also concerned whether respondent would be able to attend to a child's needs in the middle of the night. At the time Sher wrote the report, respondent had not started alcohol counseling, but he had completed anger management counseling. Sher believed that respondent was not proactive in beginning the alcohol counseling. He did not think he had any problems with alcohol.

¶ 15    By the time Sher wrote her interim report dated February 7, 2019, respondent had engaged in counseling with a certified alcohol treatment counselor. The counselor did not believe that respondent was an alcoholic but believed that he had episodes of alcohol abuse, and he was concerned that respondent would not admit to the episodes. The counselor believed that respondent would abstain from alcohol so long as the court required it. However, Sher had "serious concerns" regarding respondent's ability to refrain from alcohol because everyone she spoke to about him said he had severe alcohol problems; respondent would not admit that he had abused alcohol in the past; and respondent violated the trial court's order prohibiting him from consuming alcohol 12 hours before visitation, and then later tried to attribute the positive test result to mouthwash. Gabriel was currently 2½ years old and had a speech delay, so if there were any problems during respondent's parenting time, he would not be able to communicate the problems to another individual.

¶ 16    Sher stated in the October 2019 report that respondent had punished his children from prior marriages inappropriately, such as kicking one on the behind, smacking them in the head, and pulling their ears. There were no reports that he had done so with Gabriel, but petitioner was concerned that it would occur in the future.

¶ 17    Sher recommended that parenting time have a "step-up" schedule, with the first two stages lasting three months. Stage two would include overnight parenting time, and stage three would expand overnight time. The purpose of the stages was to make sure that respondent was not consuming alcohol during his parenting time and that Gabriel was okay.

¶ 18    Sher recommended that ordinary decision-making authority, including for occupational and speech therapy, be awarded to petitioner because petitioner had done all the groundwork for Gabriel to receive services, and respondent had only recently become more engaged in the treatment. Petitioner had also been in charge of Gabriel's extra-curricular activities since his birth, whereas respondent did not want Gabriel participating in any activities during his parenting time.

¶ 19    On cross-examination, Sher testified that in her conversation with respondent regarding the 0.02 breath test result, she recalled them discussing metabolism rate and number of drinks. She had said that respondent's number of reported drinks did not appear consistent with a 0.02 result the following morning. On the subject of respondent peeing around the house, he had sent her an e-mail saying that he had episodes of sleep walking during graduate school and that it had not occurred recently.

¶ 20    In one of the reports, Sher stated that she was afraid that petitioner would try to control respondent's parenting time. Petitioner was an admitted alcoholic, so Sher assumed there had been periods of time in the past when she was consuming alcohol while taking care of Gabriel. In a report by Gates, he said that: petitioner began using alcohol at age 21 while in college; at times she drank daily; she had unsuccessfully attended inpatient and outpatient treatment in the past; petitioner was attending AA at the suggestion of her attorney; and there was a potential for her to relapse. Sher was aware that petitioner had been convicted of driving under the influence in 2014. Petitioner was taking several medications for psychiatric problems, such as depression, insomnia,

and anxiety. However, her psychiatrist said that the medications would not cause her difficulty in parenting Gabriel. Sher testified:

> "It was never my impression that [petitioner] was a perfect parent, nor was it my impression that [respondent] was a perfect parent. So, really, it came down to weighing, you know, two parents that were trying to do their best with significant deficits in both of their parenting skills."

Petitioner had been sober since February 23, 2018, and Sher believed that she had a strong support system, including her AA sponsor and her therapist. Sher thought that the SCRAM protocol would also ensure that Gabriel would be protected.

¶ 21    Sher agreed that, "[a]ccording to all of the experts," respondent was not an alcoholic. His anger management counselor stated that he was "at the low risk range, which means that he does not have serious violence problems."

¶ 22    Sher testified that in stage three of her recommended parenting schedule, respondent would have an average of two overnights per week and three days per week. Sher had some concerns about the overnights, but she thought the "safety measures" that were in place would protect Gabriel. When asked why she did not recommend a third overnight, Sher testified that she was looking at Gabriel's best interests. Further, petitioner had been the primary parent. Sher weighed the "impediments" of each parent, but petitioner had acknowledged that she was an alcoholic and that she had failings as a parent, and petitioner was working through her issues. In contrast, respondent lacked insight into his issues and failed to acknowledge that his discipline of his other children had been inappropriate at times, and that he had issues with alcohol. Sher weighed these considerations in trying to come up with a schedule that was in Gabriel's best interest, where he had a warm and loving relationship with respondent but also was in a safe environment. Sher had

concerns about respondent "having too much time with Gabriel based on the impediments that [were] on [his] side of the table as to parenting."

¶ 23   Petitioner provided the following testimony. She met respondent in June 2014, and they married in December 2014. During that time, respondent was rarely going to the office, so he was drinking almost every day. He would typically drink a bottle of wine or a six-pack. Respondent would then sleep until noon the next day, and petitioner had to watch his daughters if they were staying with them. There was one instance where respondent was passed out in a chair at night with Gabriel on his lap.

¶ 24   In early 2015, Sophia was threatening suicide. Petitioner asked respondent to get her help, but he said that it was a normal stage of development. Petitioner found a therapist for Sophia on her own, and petitioner later helped get her enrolled in a hospital program. In July 2016, Sophia was feeling suicidal, but respondent did not want to take her to the hospital. She ultimately went to the hospital because petitioner insisted on it. However, respondent did not want to follow the precautionary instructions given at discharge. At one point, Sophia told people at school that she had tried to commit suicide over the weekend at her mom's house, causing a soft lockdown. The hospital called respondent, and he said that she just wanted attention and should not be treated.

¶ 25   On cross-examination, petitioner admitted that after she left the marital home in February 2018, she did not allow respondent to see Gabriel for four months. She did so on the advice of her lawyer. Petitioner had never seen respondent physically punish Gabriel or purposefully cause him pain.

¶ 26   Respondent testified as follows. Regarding the incident with Calvin, Calvin was 13 years old at the time and was studying for a high school entrance exam. Respondent was taking care of Sophia and Georgia, who were about one year old. Calvin was disruptive and arguing loudly,

asking respondent to solve a math problem for him. Respondent told him to go to his room, and when he refused, he grabbed him by the ear and led him towards the staircase. The scenario repeated, and respondent grabbed him by the ear again. Later, Calvin read the book and finally solved the math problem. The rest of the day was fine, and Calvin played outside. Since that time, respondent and Calvin had no other physical altercations and had a very good relationship. There was an indicated finding by DCFS as a result of the incident, and visitation was supervised for about four months. Respondent did not believe that he did anything inappropriate, but he would not do the same thing again.

¶ 27    Regarding the soup incident with Georgia, she was 12 years old at the time. Respondent was trying to remove her from the kitchen while she was trying to force her way into the kitchen, but he was not handling her in an inappropriate way.

¶ 28    There was an issue mentioned in Sher's report with Sophia and a nebulizer. One evening, around bedtime, Sophia was complaining that she could not breathe. Sophia had asthma, and respondent listened to her breathing with a stethoscope to make sure she was not wheezing. Sophia wanted to use a nebulizer, but respondent thought that it was not warranted, especially because it was a stimulant and would have the side effect of keeping her awake. One of the girls called an ambulance, which respondent thought was an overreaction. He thought that Sophia simply did not want to sleep and was seeking attention. Respondent let the emergency personnel in, and they later said that they needed to check Sophia in the ambulance. Respondent told them that he did not think that she had difficulty breathing, but that they could check her. The emergency personnel then took Sophia to the hospital without alerting respondent. The hospital called to say that Sophia was there, and respondent drove to the hospital.

¶ 29    Georgia moved in with respondent in the summer of 2016, before Gabriel was born. She was doing very well academically and socially in high school. Respondent oversaw scheduling Georgia's medical appointments, and he was also scheduling Sophia's medical appointments until about 1½ years prior. These included 24 sessions with a therapist over a 1½-year period, and a two-week out-patient program. Respondent had also told petitioner to take Gabriel to the hospital immediately when she informed him that Gabriel had a very high fever.

¶ 30    Respondent denied that he slept until noon every day. Rather, he taught college classes in the mornings downtown and had to wake up between 7 and 8 a.m. He kept the same schedule on non-teaching days, though on those days he would linger in bed and read.

¶ 31    If respondent drank alcohol, it was only after the children went to sleep. However, he would usually work for a couple of hours first. "Drinking in moderation and in a responsible" manner was not an issue for him if a child in his care was sleeping because the child did not require his immediate attention.

¶ 32    We next summarize the testimony of Gates. He was a family therapist and alcohol and drug counselor. Sher had asked him to evaluate the parties. Petitioner had identified herself as an alcoholic, and it appeared that she was working with a good program. Gates did not see the need for monitoring her, though he agreed that there was always a potential for relapse. Petitioner had stated that her attorney suggested that she attend AA meetings, but it appeared that she was committed to the meetings.

¶ 33    Gates concluded that respondent did not show signs of alcohol use disorder, based on respondent's self-reporting. Gates thought it would be helpful if respondent were monitored by a certified counselor on a monthly basis for the next 12 months because he was concerned that respondent could still have episodes of excessive drinking.

¶ 34    Arlene Messner-Peters, a clinical social worker, testified as follows. Sher asked that she perform an anger management evaluation of respondent. Messner-Peters concluded that respondent did not have any serious violence problems. She recommended that respondent engage in four to eight individual therapeutic sessions that focused more on parenting than anger management. Respondent completed five sessions.

¶ 35    The trial court made its findings in an order entered on June 20, 2019. The trial court evaluated the relevant factors under section 602.5(c) of the Illinois Marriage and Dissolution of Marriage Act (Marriage Act) (750 ILCS 5/602.5 (West 2018)), regarding the allocation of decision-making responsibilities, as follows. (1) The child's wishes: Gabriel had turned two in November 2018, and the evidence showed that he loved and enjoyed spending time with both parents. However, he was too young to express a reasoned and independent preference. (2) The child's adjustment to home, school, and community: This factor weighed equally in favor of both parties, as Gabriel was adapted to and enjoyed both residences, which were in very close proximity. (3) The mental and physical health of all individuals: This factor was an important consideration. Petitioner had acknowledged her alcoholism and had maintained sobriety since February 23, 2018. She was addressing many mental health issues with prescribed medication and the help of professionals. It was imperative that she maintain the healthy lifestyle she had demonstrated during the litigation. Respondent believed that his drinking was under control. Evidence suggested that his drinking patterns and their effects on respondent's awareness of his surroundings was potentially detrimental to Gabriel. There was evidence that his habitual night-time drinking left him incoherent and therefore unavailable as a caretaker. The court was concerned about respondent's belief that once the children were asleep, he was free to drink as he pleased.

¶ 36    (4) The parents' ability to cooperate in decision-making: The GAL concluded that the parties did not trust each other to make decisions for Gabriel, and this was borne out during their respective trial testimony. They had very different views on the need for the involvement of professionals in various fields for Gabriel, which had prevented joint decisions. Examples of the parties' disagreements included petitioner's insistence that respondent seek help for Sophia when she was making statements of self-harm, and his belief that intervention was not necessary. Another example was respondent's decision to withhold a nebulizer for Sophia when she was having trouble breathing, which resulted in her ultimately being transported by ambulance to the hospital. The parties seemed incapable of reaching common ground, often when time was of the essence.

¶ 37    (5) The level of past involvement in decision-making by both parties: During the marriage, petitioner assumed the role of homemaker and was responsible for the daily activities and decisions related to Gabriel's well-being. Respondent was responsible for the family's financial support through his employment as a professor. He had made more efforts to be involved in the past months. (6) Any prior agreement or course of conduct between the parents as to decision-making for the child: The parties had not reached an agreement and had not managed to cooperate in this regard. (7) The parents' wishes: Petitioner believed that she should be granted sole decision-making authority, and respondent believed that they should share in this authority. (8) The child's needs: Gabriel would benefit from the involvement of both parents when they were sober, clear-minded, and capable of meeting all his needs. Petitioner was more capable at this time as demonstrated by her pursuit of professionals who had benefitted Gabriel's growth and development. (9) The distance between the parents' residences: The parents resided within minutes

of each other, which allowed Gabriel to easily continue his extra-curricular activities, treatment, and education while in either home.

¶ 38    (10) Whether a restriction on decision-making was appropriate: Both parties had been monitored for alcohol consumption with a SCRAM device. Petitioner had not consumed alcohol, whereas respondent had some problems adhering to the trial court's order prohibiting the consumption of alcohol in the hours before his parenting time. The GAL's recommendations included input from people such as Gates and Messner-Peters regarding the necessity for any restrictions on respondent's parenting time. The GAL continued to recommend that petitioner be allocated significant decision-making authority on ordinary medical, educational, and extracurricular issues with a duty to consult respondent. (11)  The willingness and ability of each parent to facilitate and encourage a close relationship with the other parent and child: Both parties lacked trust and comfort with the other's role with Gabriel, but they also recognized that it was best to facilitate a loving relationship between the child and other parent.

¶ 39    (12) Physical violence or threat of physical violence directed against the child: The trial court did not find physical violence to be an issue with Gabriel despite prior disciplinary problems between respondent and Calvin. Both parties agreed that corporal punishment should be avoided. (13) The occurrence of abuse against the child or other member of the child's household: The only evidence of abuse related to respondent's discipline of his older children, but there was no evidence that respondent would intentionally harm Gabriel. (14) Whether either parent was a sex offender: This factor was not applicable.

¶ 40    The trial court concluded that it was in Gabriel's best interest that the parties share significant decision-making responsibilities related to his extra-curricular and extraordinary

medical decisions, but that petitioner have sole responsibility with ordinary treatment and education decisions.

¶ 41    The trial court next considered the factors under section 602.7(b) of the Marriage Act (750 ILCS 5/602.7(b) (West 2018)) in determining Gabriel's best interests for the purposes of allocating parenting time: (1) Wishes of both parents: Petitioner wanted respondent to have restricted parenting time, whereas respondent wanted equal parenting time. (2) Wishes of the child: Gabriel was too young to express a reasoned and independent preference. (3) Amount of time each parent spent performing caretaking functions for the 24 months before the filing of a petition for allocation of parenting time: Petitioner was the primary caretaker while respondent went to work during the day. (4) Any prior agreement relating to caretaking functions: There was no formal agreement, rather just an assumption that petitioner would manage health and education issues and provide daily caretaking for Gabriel. (5) Interaction between child and parent, siblings, or other significant person: Gabriel enjoyed relationships with both parents and extended family in both households. (6) Child's adjustment to home, school, and community: Gabriel was adjusted to the separate households and was progressing in his speech, education, and other areas. If both parents were healthy and sober, both homes would provide for Gabriel's needs. (7) Mental and physical health of the individuals: As previously detailed, both parents had issues with alcohol consumption, and petitioner had other health-related problems. Both parents could maintain a mentally and physically healthy lifestyle. (8) The child's needs: Both parents could address Gabriel's current needs, assuming they maintained sobriety. (9) Distance between the residences: Distance was not a burden for transporting Gabriel for parenting time and daily activities.

¶ 42    (10) The need for a restriction on parenting time: As detailed in the GAL's reports, many concerns remained with both parties' use of alcohol. Petitioner had to abstain completely.

Respondent believed that drinking wine was his right, but excess alcohol consumption placed Gabriel at risk, regardless of the time of day or night, as he needed an alert and functioning parent at all times. Evidence suggested that respondent's insistence on strict bedtimes was related to his desire to begin drinking. Past incidences of walking around the home late at night and urinating in strange places were examples of the harmful effects of intoxication. Both parties had to be restricted from consuming alcohol during their respective parenting times. (11) Physical violence or threat of physical violence directed at the child or other household member: Past allegations regarding respondents' actions towards his other children were founded but remote in time. Respondent had matured as a parent and no longer considered corporal punishment appropriate, so he was not a risk to Gabriel.

¶ 43    (12) The willingness of each parent to put the child's needs ahead of his or her own: Petitioner was most attentive and responsive to Gabriel's needs. She had addressed his immediate needs appropriately and sought out long-term resolutions when required, as shown by Gabriel's improvement in speech and social skills from occupational therapy. Respondent had often relied on his own belief of whether a need was legitimate or what treatment was necessary. This was particularly true with several incidents regarding Sophia. (13) The willingness and ability of each parent to facilitate and encourage a close relationship with the other parent and child: "While difficult," the parties agreed that Gabriel needed and would benefit from a close relationship with both parents. (14) The occurrence of abuse against the child or other household member: Gabriel was not at risk of physical harm at either home, but the concern stemmed from either party becoming incapacitated due to intoxication. (15 and 16) Whether either parent was a sex offender and the terms of a parent's military family-care plan: These factors were not applicable.

¶ 44    The trial court found that it was:

> "in Gabriel's best interests to maximize his parenting time with both parents, recognizing the need of each parent to be appropriate and available during parenting time. The principal concern will be sobriety and a willingness to respond appropriately to the medical issues of the child, particularly when Gabriel [was] of limited ability to communicate."

The trial court designated petitioner as the custodian for statutory purposes. It awarded respondent parenting time in a two-step plan. For the first step, lasting three months, respondent would have Monday overnight from 6:30 p.m. to Tuesday at 6:30 p.m., and Thursday and Sunday from 9 a.m. to 6:30 p.m. Thereafter, he would have every Tuesday and Thursday from 9 a.m. to 6:30 p.m., and every other weekend from Friday at 6:30 p.m. to Sunday at 6:30 p.m. The trial court divided holidays equally and allowed for three "special occasion" days per year for each parent. It stated that either party could file a motion to modify the parenting schedule only after 24 months, absent a showing that changed circumstances required a modification to serve Gabriel's best interests.

¶ 45    The trial court further ordered specific requirements related to alcohol and parenting time. For respondent, he was to wear a SCRAM bracelet at all times, with real-time reports sent to petitioner, for 12 months. Respondent was not to consume any alcohol during and for 12 hours preceding parenting time. He was to attend alcohol counseling sessions until his counselor felt that respondent no longer needed to continue therapy. In six months, respondent could petition the trial court for modification of the order to replace the SCRAM bracelet for a "Soberlink" device, or for other relief from the SCRAM requirement.

¶ 46    Petitioner was not to consume alcohol and continue to attend AA, as recommended by her sponsor. She was also to continue to meet with her therapist and psychiatrist, as recommended.

Petitioner was to use Soberlink testing twice a day, with real-time reports sent to respondent. She could petition the trial court in six months to remove the Soberlink device.

¶ 47    On July 8, 2019, petitioner filed a motion to clarify and/or reconsider the judgment. As relevant here, she asked that the trial court require respondent to petition the court for removal of the SCRAM device; that her monitoring requirement cease automatically at the end of six months; and that respondent be required to additionally use Soberlink on the days that he had overnight parenting time. On July 10, 2019, the trial court ruled that neither party had to petition the court to cease use of their alcohol monitoring devices at the end of their prescribed periods, as long as there were no violations. It denied petitioner's request that respondent also be required to use Soberlink.

¶ 48    Respondent timely appealed and has filed *pro se* briefs.

¶ 49                                    II. ANALYSIS

¶ 50                A.  Alleged Deficiencies in the Record and in Respondent's Brief

¶ 51    Petitioner argues that respondent has failed to provide this court with a complete record on appeal, in violation of Illinois Supreme Court Rule 321 (eff. Feb. 1, 1994). Petitioner points out that respondent failed to include any of the exhibits used at trial by the parties, including the GAL's reports and Gates' alcohol assessments of the parties. Petitioner argues that although respondent maintains that the exhibits were withheld or withdrawn from the record by the trial court, respondent simply failed to include them in the record. Petitioner cites *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984), where our supreme court stated  that the appellant has the burden to provide a sufficiently complete record of the trial proceedings to support his claims of error, and we must resolve any doubts arising from the lack of a complete record against the appellant, including presuming that the trial court's order was entered in conformity with the law and had a sufficient factual basis.

¶ 52    We agree with petitioner that there is no evidence in the record that the exhibits were not available to be included in the record on appeal. As such, where warranted, we will resolve any doubts arising from the lack of a complete record against the respondent. *Id.* We recognize that appellant is appealing *pro se*, but *pro se* litigants are not entitled to more lenient treatment than attorneys. *Gillard v. Northwestern Memorial Hospital*, 2019 IL App (1st) 182348, ¶ 45.  Parties who choose to represent themselves in Illinois courts must comply with the same rules as licensed attorneys, and they are held to the same standards. *Holzrichter v. Yorath*, 2013 IL App (1st) 110287, ¶ 78. That being said, the lack of exhibits does not entirely preclude review of the issues respondent raises on appeal, as we have the common law record and reports of proceedings.

¶ 53    Petitioner additionally argues that respondent's brief violates supreme court rules to the extent that his appeal should be dismissed. Petitioner argues that there are formatting errors, his facts consist mainly of lengthy quotations from the record, he does not sufficiently cite to the record on appeal, and he fails to cite sufficient authority.

¶ 54    Although there are deficiencies in respondent's briefs, they do not preclude our review to the extent that we would strike portions of the brief or dismiss the appeal.

¶ 55                     B. Restriction on Respondent's Parenting Time

¶ 56    Turning to the merits, respondent first argues that the trial court erred in restricting his parenting time to one night per week, on average, without finding that his exercise of parenting time would seriously endanger Gabriel's physical mental, moral, or emotional health. Respondent cites section 602.7 of the Marriage Act (750 ILCS 5/602.7 (West 2018)). Section 602.7(a) provides that the trial court shall allocate parenting time according to the child's best interests. 750 ILCS 5/602.7(a) (West 2018). Section 602.7(b) states:

"It is presumed both parents are fit and the court shall not place any restrictions on parenting time as defined in Section 600 and described in Section 603.10, unless it finds by a preponderance of the evidence that a parent's exercise of parenting time would seriously endanger the child's physical, mental, moral, or emotional health." 750 ILCS 5/602.7(b) (West 2018).

"Restriction on parenting time" is defined in section 600 as "any limitation or condition placed on parenting time, including supervision." 750 ILCS 5/600 (West 2018). Section 603.10(a) of the Marriage Act (750 ILCS 5/603.10 (West 2018)) states:

"After a hearing, if the court finds by a preponderance of the evidence that a parent engaged in any conduct that seriously endangered the child's mental, moral, or physical health or that significantly impaired the child's emotional development, the court shall enter orders necessary to protect the child."

The statute lists restrictions that the trial court may impose upon parental decision-making and parental time, which include, among other things: reducing, eliminating, or adjusting decision-making or parental time; supervision; and requiring a parent to abstain from possessing or consuming alcohol or non-prescribed drugs during parenting time and within a specified period before the exercise of parenting time. *Id.*

¶ 57    Respondent argues that a disproportionate allocation of parenting time, and in particular overnights, is a restriction on parenting time where a party has sought equal parenting time. He argues that his schedule is conducive to a 50-50 parenting plan, the parties live about one mile apart, and Gabriel is well-adjusted to his home because he spent most of his life there. Respondent argues that the allocation of an average of only one overnight per week therefore amounts to a

restriction, but that the trial court's findings relating to restrictions do not constitute the requisite finding of serious endangerment necessary for imposing restrictions.

¶ 58    Respondent cites *In re Custody of G.L.*, 2017 IL App (1st) 163171, for the proposition that such a finding is necessary. There, the appellate court held that the trial court placed a restriction upon the mother's parenting time by requiring her to exercise parenting time within a one-hour drive of the father's home, unless the visitation was for longer than 72 hours. *Id.* ¶¶ 16, 34. It held that, however, the trial court never made the necessary factual finding, whether explicitly or implicitly, that a preponderance of the evidence showed that the mother's exercise of her parenting time would seriously endanger the child's physical, mental, moral, or emotional health. *Id.* ¶ 34.

¶ 59    Respondent argues that the trial court's findings here are insufficient. Respondent maintains that the trial court's finding that respondent thinks drinking wine is his right has no basis in the record, as he testified that he believed drinking in moderation and responsibly was not an issue. He argues that the finding that his insistence on strict bedtimes was related to his desire to begin drinking was contradicted by his testimony that he would usually work for a couple of hours after the children slept before drinking alcohol. Regarding the trial court's statement that there were past instances of walking around the house and urinating in strange places, respondent argues that these were instances of sleep walking that he had experienced 15 years earlier, before Gabriel was even born, and that no one was endangered by the conduct. Respondent argues that the fact that Georgia lives with him full-time further makes it clear that Gabriel was not in danger while in respondent's care.

¶ 60    Whether the trial court's allocation of parenting time constitutes a restriction on parenting time under the relevant statutes involves an issue of statutory construction that we review *de novo*.

See *Sperl v. Henry*, 2018 IL 123132, ¶ 23 (the construction of a statute presents a question of law that we review *de novo*). We note that not every condition that a trial court places upon a parent is a restriction. *In re Marriage of Fields*, 283 Ill. App. 3d 894, 906 (1996). Examples of visitation restrictions include a termination of visitation, a prohibition on overnight visitation, or a requirement of supervised visitation. *In re K.E.B.*, 2014 IL App (2d) 131332, ¶ 33. The appellate court has interpreted the serious endangerment requirement to protect the right of a noncustodial parent to standard visitation, which includes unsupervised, overnight visitation in the noncustodial parent's home. *In re Marriage of Saheb & Khazal*, 377 Ill. App. 3d 615, 622 (2007); see also *In re Marriage of Mayes*, 2018 IL App (4th) 180149, ¶ 56 (serious-endangerment standard in section 603.10 applies in the same manner as the prior, repealed statute addressing restrictions to visitation). In the context of a modification to visitation versus a restriction on visitation, a restriction must meet the serious endangerment test, whereas a modification must meet the less onerous best-interests standard. *In re K.E.B.*, 2014 IL App (2d) 131332, ¶ 33. A restriction is distinguished from a modification not by the actual change in visitation, but rather by the purpose for the change. *Id.*

¶ 61     Respondent cites no authority for his argument that anything less than an equal division of parenting time constitutes a restriction on visitation where a party desires an equal division. To the contrary, the above-mentioned authority shows that a restriction on parenting time requiring a finding of endangerment to the child pertains only to requirements that limit standard visitation, which is understood to be unsupervised, overnight visitation in the noncustodial parent's home (*In re Marriage of Saheb & Khazal*, 377 Ill. App. 3d at 622), such as by terminating visitation, prohibiting overnight visitation, or requiring supervised visitation (*In re K.E.B.*, 2014 IL App (2d) 131332, ¶ 33). This interpretation is consistent with the definition of "[r]estriction on parenting

time" as "any limitation or condition placed on parenting time, including supervision" (750 ILCS 5/600 (West 2018)). This interpretation is also consistent with the holding in *In re Custody of G.L.*, 2017 IL App (1st) 163171, as there the restriction prevented the mother from exercising overnight visitation in her home through its requirement that visitation for less than 72 hours take place within a one-hour drive of the father's home. Here, no such restrictions were enacted.

¶ 62    Even if, *arguendo*, the visitation awarded to respondent in step 2[1] could be considered a restriction on visitation as defined by section 600, we would conclude that the trial court's findings implicitly meet the requirements for imposing a restriction on visitation and were not against the manifest weight of the evidence. See *In re Marriage of Mayes*, 2018 IL App (4th) 180149, ¶ 59 (applying manifest-weight-of-the-evidence standard in reviewing whether the evidence showed serious endangerment). First, the trial court's findings were based on evidence presented at trial, which would satisfy the need for a hearing and factual findings under section 603.10. Next, under factor 10 of the analysis for allocating parenting time (see 750 ILCS 5/602.7(b) (West 2018)), the trial court found that, as described in the GAL's reports, there were many concerns about the parties' use of alcohol. The trial court found that respondent believed that drinking was his right, which put Gabriel at risk regardless of the time of day; evidence suggested that respondent's insistence on strict bedtimes was related to his desire to begin drinking; and past incidents of walking around the home late at night and urinating in strange places were examples of the harmful effects of intoxication. Respondent argues that his own testimony refuted these findings, but Sher testified that respondent's previous wives made statements to the contrary, and it was the trial

_____

[1] Step 1 of the visitation plan ended three months after the trial court's June 20, 2019, order and is therefore not at issue.

court's role to assess witness credibility. See *In re Marriage of Blume*, 2016 IL App (3d) 140276, ¶ 31 (the trial court is in the best position to determine a witness's credibility, and a court of review will not disturb its assessment unless the finding is against the manifest weight of the evidence). Additionally, the trial court cited the GAL's reports, and respondent's failure to ensure that these were included in the record on appeal results in our resolving any doubts on these questions against respondent. See *Foutch*, 99 Ill. 2d at 391-92.

¶ 63    The trial court stated elsewhere in its findings that petitioner had acknowledged her alcoholism, maintained sobriety since February 2018, and was addressing her issues with professional help, whereas respondent did not acknowledge his issues with his habitual night-time alcohol consumption, which caused him to be unaware of his surroundings, incoherent, and unavailable as a caretaker. These findings were supported by testimony from Sher and potentially by her reports. The trial court also found that respondent had violated a prior court order prohibiting the consumption of alcohol in the hours before his parenting time. In sum, even if one overnight per week could be considered a restriction on visitation, the trial court's findings were sufficient to support such a restriction.

¶ 64                              C. Allocation of Parenting Time

¶ 65    Respondent alternatively argues that the trial court's allocation of parenting time was against the manifest weight of the evidence. Respondent argues that the trial court reached its allocation decision by repeatedly ignoring and suppressing petitioner's impediments to parenting while accentuating issues ascribed to him, thereby exhibiting a "flagrant bias." Specifically, he maintains that the trial court ignored that petitioner: had been arrested for DUI in 2014; had a long history of alcoholism, insomnia, depression, anxiety, and ADHD; was not successful in past alcohol treatment programs; and was known to drink while taking care of Gabriel when he was

awake. Respondent argues that the trial court seemed to ignore petitioner's alcohol issues based on her current engagement with AA, but it was not reasonable to believe that her history would not repeat itself. Respondent argues that, in contrast to petitioner, he does not suffer from any mental conditions and has not been convicted of DUI. He argues that Georgia is thriving while living with him, and that she and Gabriel have a close relationship. Respondent maintains that while the trial court chose to ignore petitioner's history, it demonstrated its bias against him by citing his sleepwalking, which took place over a decade before Gabriel was born, to justify limiting respondent's parenting time. Respondent additionally argues that because Gabriel resided in his home for the first part of his life, it would be in his best interests to spend more time there. Respondent argues that Sher also recommended two overnights per week with him, which is more than what the trial court awarded.

¶ 66    Petitioner argues that the trial court heard voluminous evidence that gave rise to its concerns about respondent's comparative parenting abilities. Petitioner cites Calvin's testimony about physical abuse, concern about respondent's drinking, and concerns about respondent caring for Gabriel. She cites her own testimony about respondent's excessive drinking, his aggressive behavior, and her feeling that Gabriel was not safe with respondent based on a series of incidents, including him being passed out at night with Gabriel on his lap. Petitioner argues that respondent violated the trial court's order about not drinking prior to parenting time with Gabriel, and she points to Sher's testimony that she believed that respondent changed his story to deny having consumed alcohol. Petitioner also cites Sher's testimony that respondent's previous wives said that he strictly enforced the children's bedtimes so that he could begin drinking, and then he would urinate in various places in the house once drunk. Petitioner further cites Sher's testimony about concerns with respondent's physical punishments of his other children, his lack of insight into his

deficiencies as a parent, her doubts about respondent's ability to control his alcohol use, and her satisfaction with petitioner's commitment to sobriety. Petitioner notes that Gates was similarly concerned that respondent could still have episodes of excessive drinking.

¶ 67   Petitioner maintains that despite all this testimony, the trial court still allocated to respondent regular, graduated parenting time and joint decision-making with petitioner as to everything except ordinary medical care. She argues that while both parties had concerning issues, the trial court was clearly heartened by her sobriety, her use of medication and medical professionals, and the fact that she was historically Gabriel's primary caretaker, in concluding that she was more capable of meeting his needs at this time. Petitioner contends that, conversely, the trial court found that respondent vigorously defended his "right" to drink, which was potentially detrimental to Gabriel, because his drinking patterns caused him to be unaware of his surroundings and could render him incapable of taking care of his son. Finally, petitioner points out that the trial court made specific findings as to each statutory factor regarding the allocation of parenting time.

¶ 68   A trial court's findings regarding a child's best interests are entitled to great deference because it is in a better position than the reviewing court to observe the parties' personalities and temperaments, and to assess witnesses' credibility. *In re Marriage of Whitehead & Newcomb-Whitehead*, 2018 IL App (5th) 170380, ¶ 21. We will overturn a trial court's determination as to a parenting schedule only if it is against the manifest weight of the evidence, is manifestly unjust, or is the result of an abuse of discretion. *Id.* ¶¶ 20-21. A judgment is against the manifest weight of the evidence if the opposite conclusion is apparent, or if the trial court's findings appear unreasonable, arbitrary, or not based on the evidence. *Id.* ¶ 21. A trial court abuses its discretion only where its ruling is arbitrary, fanciful, or unreasonable, or where no reasonable person would

take the same view. *Andersonville South Condominium Ass'n v. Federal National Mortgage Co.*, 2017 IL App (1st) 161875, ¶ 28.

¶ 69    Although respondent claims that the trial judge was biased against him, a trial judge is presumed to be impartial, and the party alleging prejudice has the burden of overcoming this presumption. *Thomas v. Weatherguard Construction Co.*, 2018 IL App (1st) 171238, ¶ 47. A judge's rulings alone will rarely constitute a valid basis for a claim of judicial bias or partiality. *Id.* ¶ 48. Even judicial remarks during a trial that are critical or disapproving of, or hostile to, counsel, the parties, or their cases, generally are not sufficient for a bias or partiality challenge. *Id.* ¶ 49. Instead, the remarks must reveal a bias stemming from an extrajudicial source or reveal such a high degree of favoritism or antagonism such that a fair judgment is impossible. *Id.* In this case, there is no extrajudicial source for the trial judge's alleged bias, and he did not make any remarks that show a high degree of favoritism or antagonism. Accordingly, respondent has not overcome the presumption that the trial judge was impartial.

¶ 70    The trial court made detailed findings regarding the factors in section 602.7(b). It recognized that Gabriel had a good relationship with both parents and their extended families, that he was adjusted to both homes, and that both homes could provide for his needs if the parents remained healthy and sober. It stated that the distance between the two homes was not an issue, and that physical violence by respondent was no longer a concern. However, it also found that petitioner had been Gabriel's primary caretaker and that she was most responsive in addressing Gabriel's needs for therapy, whereas respondent relied on his own beliefs as to what treatments were necessary, as shown with several incidents regarding Sophia. It cited the GAL's reports in stating that there were concerns about both parties' use of alcohol, but that respondent strictly enforced bedtimes to begin drinking; that he believed that drinking wine was his right, but excess

alcohol consumption put Gabriel at risk; and that past incidences of walking around the home late at night and urinating in strange places were examples of the harmful effects of intoxication. As stated, Sher's testimony supported these findings, and we must conclude that her reports did as well, as respondent failed to include them in the record. See *Foutch*, 99 Ill. 2d at 391-92. The trial court further stated that the main concern was sobriety and a willingness to respond appropriately to Gabriel's medical issues, particularly because Gabriel currently had a limited ability to communicate. The trial court's findings had support in the evidence, so we cannot say that its allocation of parenting time was against the manifest weight of the evidence, manifestly unjust, or an abuse of discretion. The trial court apparently did not institute the exact schedule suggested by the GAL (again, we are missing the GAL's reports), but the GAL's recommendation was exactly that—a recommendation—that the trial court was not required to implement. See *In re Marriage of Petraitis*, 263 Ill. App. 3d 1022, 1031-32 (1993). Finally, the trial court's ruling provides that either party could file a motion to modify the schedule after 24 months.

¶ 71                    D. SCRAM Alcohol Monitoring

¶ 72    Last, respondent argues that the trial court's requirement he pay for and wear a SCRAM alcohol monitoring bracelet for one year was a restriction on his parenting time that the trial court improperly imposed without finding that he did or could seriously endanger Gabriel. Respondent argues that the bracelet costs $11 per day, for a total cost to him of over $4,000. He argues that it is bulky and uncomfortable to wear and cannot be submerged in water, meaning that he can no longer take Gabriel to the pool or beach, or swim for his own exercise. He maintains that the bracelet is additionally humiliating because it makes an audible noise when taking a reading every 30 minutes, which is audible to family members, friends, and co-workers. According to respondent, SCRAM bracelets are intended to keep chronic DUI offenders out of jail or keep

family members safe from perpetrators of domestic violence, so its use here is both unlawful and inappropriate. Respondent argues that the bracelet was not recommended by any of the three experts appointed by the trial court.

¶ 73    As stated, section 603.10 lists restrictions that a trial court may impose on parenting time, which include requiring a parent to abstain from consuming alcohol during parenting time and for a specified period of time before parenting time. 750 ILCS 5/603.10 (West 2018). Accordingly, we agree with respondent that the requirements surrounding alcohol constitute a restriction which requires a finding of serious endangerment to the child's mental, moral, or physical health. *Id.*; 750 ILCS 5/602.7(b) (West 2018). The trial court did not make an explicit finding to this effect, but as previously discussed, the trial court's findings regarding respondent's alcohol use and its potential effects on Gabriel (see *supra* ¶¶ 63-64) amount to an implicit finding of serious endangerment, and were not against the manifest weight of the evidence. Given the concerns outlined by the trial court, and its finding that respondent had previously violated a court order prohibiting him from drinking alcohol for the 12 hours before parenting time, it was not an abuse of discretion for the trial court to order that respondent wear a SCRAM monitoring bracelet. See *In re Marriage of Mayes*, 2018 IL App (4th) 180149, ¶ 56 (trial court exercises discretion in selecting appropriate restrictions to parenting responsibilities to provide for the child's safety and welfare). Although respondent argues that SCRAM is meant primarily for people with DUIs and domestic violence issues, he cites no authority or support in the record for this assertion, nor do we have copies of the experts' reports. Additionally, the requirement was a temporary measure in that the trial court specifically allowed respondent to petition the court after six months to replace the SCRAM bracelet with a Soberlink device, or for other relief from the SCRAM requirement.

The six-month mark will occur this month, so respondent will soon be able to seek a cessation of or changes to the SCRAM requirement.

¶ 74                                    III. CONCLUSION

¶ 75     For the reasons stated, we affirm the judgment of the Lake County circuit court.

¶ 76     Affirmed.