# Illinois Official Reports

## Appellate Court

***In re Marriage of Mayes*, 2018 IL App (4th) 180149**

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF SARAH DRAPER MAYES, Petitioner-Appellee, and JAMES A. MAYES, Respondent-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-18-0149 |
| Filed | September 4, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Sangamon County, No. 10-D-978; the Hon. Matthew Maurer, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | G. Edward Murphy and Michael L. Fenger, of Murphy & Dunn, P.C., of Normal, for appellant.<br><br>Kelli E. Gordon, of Springfield, for appellee. |
| Panel | JUSTICE KNECHT delivered the judgment of the court, with opinion.<br>Presiding Justice Harris and Justice Cavanagh concurred in the judgment and opinion. |

¶ 1 Respondent father, James A. Mayes, appeals from the trial court's judgment granting the emergency motion of petitioner mother, Sarah Draper Mayes, and restricting his parenting time. On appeal, James argues we should reverse the trial court's judgment because Sarah failed to present sufficient evidence to show his conduct seriously endangered his children's mental and emotional health. We affirm.

¶ 2                          I. BACKGROUND

¶ 3 In December 1992, Sarah and James married. During their marriage, the parties had two children, E.M. (born July 12, 2002) and J.A.M. (born July 30, 2007). In November 2010, the parties separated.

¶ 4          A. Dissolution of Marriage and Order of Protection

¶ 5 On December 8, 2010, Sarah filed a petition for dissolution of marriage and a petition for emergency relief. Sarah requested, in part, she be awarded temporary custody of the children. On December 15, 2010, the trial court entered a temporary order, granting Sarah temporary custody of the children and allowing James visitation.

¶ 6 On December 20, 2010, Sarah filed a petition for an order of protection in Sangamon County case No. 10-OP-1932. That same day, the trial court entered an *ex parte* order of protection. The court later consolidated case No. 10-OP-1932 with this case, Sangamon County case No. 10-D-978. The record does not contain a copy of the *ex parte* order of protection.

¶ 7 On January 24, 2011, the State charged James in Sangamon County case No. 11-CM-86 with violation of an order of protection (720 ILCS 5/12-30(a) (West 2010)). James later pleaded guilty to the charge and was sentenced to one year of court supervision.

¶ 8 On January 31, 2011, James filed a motion to establish a provider for supervised visitation. Following March 9 and 24, 2011, hearings, the trial court granted James's motion and ordered Jane Dodson to supervise visitation between James and the children.

¶ 9 At a November 22, 2011, hearing on Sarah's dissolution petition, the trial court heard evidence concerning the supervised visitations between James and the children. We have previously set forth that evidence as follows:

"Dodson testified James would get 'mad' over where the parties ate during the supervised visitation. On one occasion James got 'mad' because someone other than Sarah was driving her van when the children arrived for visitation. James spoke of the divorce during visitations, 'raise[d] his voice' to Sarah, talked about his health conditions in front of the children, called his daughter a 'liar' on several occasions, and threatened to call the Department of Children and Family Services. James discussed calling the police in the children's presence. This caused the parties' son to cry and 'go[ ] ballistic.' During one visitation in the park, James gave his daughter a 'Nook' (electronic book). James insisted Sarah join them so he could demonstrate how to operate the Nook. When she refused, James withheld the Nook from his daughter. On four or five occasions James has 'talked poorly' about Sarah in front of the children, saying, for example, 'your mom is going to lose the house.' Dodson feels James is

'controlling.' Dodson testified Sarah remains parked outside in her vehicle during visitations but it is not disruptive to the children.

James testified Sarah is always present during his supervised visitations with the children and it is disruptive to the children. James did not threaten to call the police on Sarah in front of the children. James has 'never called [his daughter] to her face a liar [*sic*].' James testified he never told the children their mother would lose the home.

James testified he did not give his daughter a Nook and then take it away. James explained he put the Nook back in his Jeep 'for security reasons.' James said it was not him who wanted Sarah to come over to their table at the park; it was the parties' son who wanted Sarah involved in his birthday celebration.

James admitted he pleaded guilty to violation of the order of protection and was placed on court supervision. James explained he violated the order in January 2011 because he had a 'bad gut feeling' something was wrong at the marital residence. James sat in the backyard of the marital residence, covered with a blanket. James has not violated the order since the January incident." *In re Marriage of Draper-Mayes*, 2013 IL App (4th) 121006-U, ¶¶ 28-31.

That same day, the trial court granted a plenary order of protection in case No. 10-OP-1932. The plenary order of protection, which is contained in the record on appeal, includes E.M. and J.A.M. as protected parties. The plenary order of protection was later extended until February 2014.

¶ 10    In April 2012, the trial court entered a dissolution judgment, awarding, in part, Sarah full custody of the children and ordering supervised visitation between James and the children.

¶ 11    In September 2012, James appealed from the judgment of dissolution, arguing, in part, the trial court erred in ordering supervised visitation. *Id.* ¶ 39. In March 2013, we entered an order rejecting James's argument, concluding, based on the evidence presented, the court did not abuse its discretion in ordering visitation be supervised. *Id.* ¶¶ 55-65.

¶ 12                                    B. Modification to Visitation

¶ 13    In February 2014, the trial court entered an order dismissing the plenary order of protection and providing for a gradual transition from supervised to unsupervised visitation. Commencing April 5, 2014, James was allowed, in part, unsupervised visitation on alternating weekends from 3:45 p.m. on Friday to 7 p.m. on Sunday and alternating Wednesdays from 3:45 p.m. to 8 p.m. during the summer months.

¶ 14    The order modifying visitation contained a provision concerning E.M.'s cell phone usage. The provision provided as follows:

"During the visitations, a smart phone may be taken by [E.M.] Use of the phone shall be *** limited to one [c]all per day during normal visitation and vacation. [James's] punishment regarding the smart phone cannot eliminate this use."

¶ 15                                    C. Sarah's Emergency Motion

¶ 16    In October 2017, Sarah filed an emergency motion under section 603.10(a) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/603.10(a) (West 2016)), seeking to restrict James's parenting time. Sarah alleged James's "controlling and angry behavior" had escalated since July 2017, and she cited multiple incidents in support of her allegation. Sarah

argued "James's behavior seriously endanger[ed] the children's mental, moral, and physical health such that supervised parenting time [was] needed."

¶ 17                    D. James's Motion to Dismiss Sarah's Emergency Motion

¶ 18    In November 2017, James filed a motion to dismiss Sarah's emergency motion, arguing the preponderance-of-the-evidence standard found in section 603.10 violated the due process guarantees of the United States and Illinois Constitutions. In contesting James's argument, Sarah noted the serious-endangerment standard contained in section 603.10 was a "stringent" and "onerous" standard. Following a December 2017 hearing, the trial court denied James's motion to dismiss.

¶ 19                    E. Hearing on Sarah's Emergency Motion

¶ 20    On January 23, January 27, and February 2, 2018, the trial court held a hearing on Sarah's emergency motion. The court heard testimony from (1) 15-year-old E.M., who testified in open court with her mother and father present; (2) Sarah; (3) James; (4) James's fiancée, Julie Robertson; and (5) police officer Roger Smith. The testimony largely related to three incidents since July 2017 and the impact those incidents had on the children.

¶ 21    In July 2017, James, Julie, E.M., J.A.M., and Julie's two children visited Disney World on vacation. While there, arguments occurred both at one of the parks and at the hotel.

¶ 22    E.M. testified the argument at the park occurred between her father and Julie. When asked to describe her father's appearance and the sound of his voice during the argument, E.M. testified "[i]t was like yelling, was loud, and like everyone's faces were red and stuff." When asked if the argument between her father and Julie frightened her, E.M. testified "[a] little bit, yeah." After the argument ended, E.M. testified they all stayed at the park.

¶ 23    The second argument occurred later at the hotel between James and E.M. Julie, J.A.M., and Julie's two children were present during the argument. James imposed a rule on vacation requiring all of the children to turn in their electronics to him at night. James imposed such a rule to assure the children would go to sleep early. The argument between James and E.M. stemmed from James's rule.

¶ 24    After preparing for bed, E.M. testified she was trying to find her cell phone in her suitcase in the hotel bedroom when her father "started getting louder and he started like coming, like, a little bit closer and his face was getting kind of red." After finding her phone, E.M. testified she did not want to give the phone to her father because she "didn't feel completely safe" and she knew she was able to keep the phone during visits. E.M. refused to turn over her phone, which she testified caused her father to become angry.

¶ 25    Julie testified James asked her to come into the bedroom after E.M. refused to turn over her cell phone. Julie indicated E.M. threatened James if he took away her phone "she would have something to talk to the [c]ourt about, to talk to the judge about." James testified E.M. stated she had "something to turn over to the judge." Julie testified E.M.'s comment upset James.

¶ 26    E.M. called her mother on her cell phone because she "didn't know what to do." After calling her mother, E.M. testified "everyone was yelling at each other." Sarah testified she could hear James "screaming" in the background and the other children crying. E.M. testified Julie told James to calm down. Sarah testified she could hear J.A.M. yelling that he wanted to talk to her and James telling him he could not. Julie acknowledged James's voice was raised

but asserted he was not yelling or screaming at E.M. James testified he did not yell or scream at any of the children. Sarah testified she told E.M. to go into the bathroom.

¶ 27 E.M. went into the bathroom with her cell phone. While in the process of closing the door, E.M. testified her father opened it, causing it to "hit [her] against the wall." Sarah testified she heard E.M. repeatedly state she was trying to get into the bathroom and then heard "a slam" and E.M. say, " 'He just pushed me against the wall.' " E.M. testified she was "cornered into a corner" and her father "was like trying to grab the phone from [me] and pushed me around to get to it." Julie testified James attempted to stop E.M. from closing the bathroom door but did not slam the door open. James testified E.M. "slammed the [bathroom] door," and he "stood in the bathroom doorway." James testified he did not push E.M. up against the wall.

¶ 28 E.M. testified her father threatened to call hotel security and have her arrested. Sarah testified E.M. screamed her father was going to have her arrested and she did not know what to do. E.M. testified her mother told her it was her (E.M.'s) decision if she wanted to give her cell phone to her father.

¶ 29 Hotel security came to the hotel room. E.M. testified she showed hotel security a photo on her cell phone of a court order indicating she could have her phone during visits. E.M. testified hotel security told her she could stay with her father or go to a juvenile facility. Sarah testified she spoke with hotel security, who indicated E.M. would have to turn over her phone or go to a juvenile facility. E.M. testified she decided to turn over her phone and stay with her father because she did not want to leave J.A.M. alone.

¶ 30 After E.M. turned over her cell phone to James, Julie called Sarah to discuss the situation and give Sarah her contact information. During that call, Sarah testified she could hear James screaming at Julie not to give Sarah her phone number.

¶ 31 The incident lasted a few hours. E.M. testified the incident caused her to feel "scared and really confused." E.M. testified she was angry she had to turn over her cell phone because she believed a court order said she was entitled to have it and because she "fel[t] safer with it." Julie testified E.M. was "very upset" that night. James testified E.M. was a little agitated the next morning but then went to the park and acted like nothing happened.

¶ 32 In October 2017, an incident occurred at James's home involving James, E.M., and J.A.M.

¶ 33 Sarah testified the incident occurred after a "bad" parenting time exchange, where James was "very agitated" because J.A.M. did not bring with him certain fundraising papers. Sarah testified James cursed at her and yelled at J.A.M. Sarah described James's anger as "over the top."

¶ 34 Later that day, E.M. testified she heard her father yelling at J.A.M. James testified he was speaking with J.A.M. about his grades and "got stern with him" because he was not paying attention or listening. James testified he was not yelling or screaming at J.A.M. but rather speaking to him in a raised, stern manner, standing approximately two feet away from him.

¶ 35 E.M. testified she went to J.A.M.'s bedroom because she did not want J.A.M. to be alone and because "if anything would have happened, I could protect him." James testified E.M. told him he could not speak to J.A.M. in such a manner. James testified he told E.M. she "just needed to go about [her] way" as "[i]t was between [him] and [J.A.M.]"

¶ 36 E.M. described her father as "red, and there was yelling and, like, his eyes were kind of narrowed." E.M. testified her father approached her and tried "to grab my phone or

something." E.M. put the phone behind her back and then left J.A.M.'s bedroom to call her mother.

¶ 37   After she left J.A.M.'s bedroom, E.M. testified her father locked the door with him and J.A.M. inside. At her mother's direction, E.M. testified she contacted the police. E.M. testified she was scared for both herself and J.A.M.

¶ 38   Officer Smith responded to James's home and spoke with E.M. Officer Smith testified the children "were upset because their father was yelling." Following the police investigation, J.A.M. and E.M. were allowed to stay with James.

¶ 39   Julie testified she and her children went to James's home later that evening and, based on the demeanor of E.M. and J.A.M., she "had no idea that anything had happened." Julie testified E.M. and J.A.M. were "acting like normal."

¶ 40   In January 2018, an incident occurred at a gas station during a parenting time exchange involving James, Sarah, and E.M.

¶ 41   After entering her father's vehicle, E.M. testified her father told her to go back with her mother to get a winter coat as the coat she was wearing was inappropriate for the cold weather. E.M. testified the coat she was wearing was a North Face fleece, which she wore to the hearing and the trial court had the opportunity to observe.

¶ 42   E.M. exited her father's vehicle and went and told her mother what her father had said. E.M. testified her mother told her to tell her father he could buy her a different coat if he believed her coat was inappropriate. Sarah testified the coat was E.M.'s "everyday" coat.

¶ 43   E.M. returned to her father's vehicle and relayed her mother's message to her father. E.M. testified her father then exited his vehicle and went to speak with her mother. Sarah testified James approached her vehicle screaming and cussing and then began pounding on her window.

¶ 44   E.M. testified her father was "really angry" and yelling when he returned to his vehicle. E.M. testified her father stated he was "going to call the police and file a report or like something about DCFS." E.M. also testified her father stated her mother did not care about her enough to supply for her needs, comments that E.M. testified her father had previously made to both her and J.A.M. E.M. told her father not to make such comments.

¶ 45   After leaving the gas station and entering the ramp to the interstate, E.M. testified her father pulled to the shoulder and told her to get out of the vehicle and walk home since she did not believe it was that cold outside. E.M. testified she told her father "no," and her father told her to "get out" again. She then said "okay," took off her seatbelt, and opened the door. After opening the door, E.M. testified her father "pull[ed] the car away really fast so I just close[d] the door."

¶ 46   While on the interstate, E.M. testified her father made three calls without the use of a speakerphone or other hands-free device. E.M. testified her father called Julie, someone about filing a report, and his attorney. James testified he did not recall making a phone call to Julie, the police, or his attorney while driving.

¶ 47   E.M. described her father's driving as "kind of like bumpy and jerky and slamming if for the red lights." E.M. indicated the incident scared her "[a] little bit."

¶ 48   Sarah generally described the children's demeanor after recent unsupervised visits with their father. Sarah testified E.M. and J.A.M. were "shaken" after the visits and required a few hours to settle down. Sarah testified E.M. would be "shut down" and "withdrawn" and J.A.M. would often cry.

¶ 49 When asked if there was a difference between supervised and unsupervised visits with her father, E.M. testified "[t]here was definitely a difference." E.M. indicated her father was "more calm" and she "felt safer" during supervised visits. E.M. also testified she "felt safer" and "that the burden wasn't always on [her] to feel, protect [J.A.M.]" during supervised visits. E.M. requested supervised visits with her father.

¶ 50 Following arguments, the trial court granted Sarah's emergency motion. The court found the evidence showed James had "an anger issue and this is a continuing issue." The court found James had "an inability to control [his] anger" and often responded inappropriately to heated situations. The court concluded James's actions "do seriously endanger the children's mental health and significantly—well, I think it impairs their mental and emotional health." The court made clear its decision was not based upon a father simply yelling at his children but rather on the "totality of the facts and the circumstances." The court ordered, in part, supervised visitation on alternating Saturdays and Sundays from 12 p.m. to 5 p.m. and alternating Wednesdays from 5 p.m. to 7 p.m. during the summer months. In so ordering, the court noted it also considered ordering James to participate in an anger-management program but decided any such participation should instead be done at James's election. The court informed James of its ability to later modify its order. The court stated:

> "Before I would modify ***, I'm going to [need to] see some changes and it's really on you Mr. Mayes *** to correct the situation ***. But I believe this is a situation of your doing and you need to make the change. I don't have any doubt that your children love you and want to be with you but this is not healthy and it's not healthy for their mental well-being."

¶ 51 This appeal followed.

¶ 52                                    II. ANALYSIS

¶ 53 Prior to addressing the merits of this appeal, we must address the timeliness of our disposition. Illinois Supreme Court Rule 311 (eff. July 1, 2017) requires accelerated dispositions in appeals involving child custody and allocation of parental responsibilities determinations. Rule 311(a)(5) states, in part, "[e]xcept for good cause shown, the appellate court shall issue its decision within 150 days after the filing of the notice of appeal." Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2017). On March 6, 2018, James filed his notice of appeal. On April 30, 2018, James filed a brief with this court, which did *not* request oral argument. On May 22, 2018, Sarah filed a responding brief, which requested oral argument. On May 29, 2018, James filed a reply brief. In his reply brief, James joined in Sarah's request for oral argument. Because of James's late request for oral argument, the earliest available date to hold oral argument was August 14, 2018, beyond the 150-day deadline. To accommodate the parties' requests for oral argument, we find good cause exists to issue our decision after the 150-day deadline.

¶ 54 On appeal, James argues we should reverse the trial court's judgment because Sarah failed to present sufficient evidence to show his conduct seriously endangered his children's mental and emotional health. Specifically, James argues the court abused its discretion by finding the testimony of his ex-wife and minor daughter was sufficient to meet the onerous, serious-endangerment standard. Sarah maintains she presented sufficient evidence for the court to conclude James's conduct seriously endangered the children's mental and emotional

health. That is, Sarah asserts the trial court's judgment was not against the manifest weight of the evidence or an abuse of its discretion.

¶ 55 Section 603.10(a) of the Act (750 ILCS 5/603.10(a) (West 2016)), which became effective January 1, 2016, provides for the restriction of parental responsibilities, decision making, and/or parenting time, due to a parent's conduct. See Pub. Act 99-90, § 5-15 (eff. Jan. 1, 2016). Section 603.10(a) states:

> "After a hearing, if the court finds by a preponderance of the evidence that a parent engaged in any conduct that seriously endangered the child's mental, moral, or physical health or that significantly impaired the child's emotional development, the court shall enter orders as necessary to protect the child." 750 ILCS 5/603.10(a) (West 2016).

Orders necessary to protect a child may include, *inter alia*, a reduction in parenting time, supervision, and/or a requirement to complete a treatment program for behavior that served as the basis for restricting parental responsibilities. *Id.* § 603.10(a)(1), (2), (8).

¶ 56 The parties agree the serious-endangerment standard contained in section 603.10(a) is to be applied in the same manner in which our courts applied the serious-endangerment standard contained in the prior, now-repealed statute addressing restrictions to visitation. See 750 ILCS 5/607(a), (c) (West 2014) (repealed by Pub. Act 99-90 (eff. Jan. 1, 2016)). The serious-endangerment standard has been described as an "onerous, stringent, and rigorous" burden to meet. *In re Marriage of Diehl*, 221 Ill. App. 3d 410, 429, 582 N.E.2d 281, 294 (1991); see also *In re Parentage of J.W.*, 2013 IL 114817, ¶ 43, 990 N.E.2d 698 (noting the same). This is because "liberal visitation [(parenting time)] is the rule and restricted visitation [(parenting time)] is the exception." *Heldebrandt v. Heldebrandt*, 251 Ill. App. 3d 950, 957, 623 N.E.2d 780, 785 (1993). Sarah, as the party seeking to restrict parenting time, had the burden of proving James's conduct seriously endangered the children. See *Marriage of Diehl*, 221 Ill. App. 3d at 429; 750 ILCS 5/603.10(a)(1) (West 2016).

¶ 57 It is well established trial courts are "vested with wide discretion in resolving visitation [(parenting time)] issues." *In re Marriage of Anderson*, 130 Ill. App. 3d 684, 688, 474 N.E.2d 911, 913 (1985); see also *In re Marriage of Minix*, 344 Ill. App. 3d 801, 803, 801 N.E.2d 1201, 1203 (2003). It has generally been stated a court's decisions on visitation or parenting time issues will not be overturned on appeal unless the court abused its discretion or a manifest injustice has been done to the child or parent. *In re Marriage of Betsy M.*, 2015 IL App (1st) 151358, ¶ 59, 46 N.E.3d 373. This court has also stated a court's decisions on visitation or parenting time issues will not be overturned on appeal unless they are against the manifest weight of the evidence or constitute an abuse of discretion. *Heldebrandt*, 251 Ill. App. 3d at 954; see also *Stockton v. Oldenburg*, 305 Ill. App. 3d 897, 906, 713 N.E.2d 259, 266 (1999) ("The appellate court will not overturn the custodial and visitation arrangements ordered by the trial court unless they are against the manifest weight of the evidence, manifestly unjust, or resulted from a clear abuse of discretion."). To determine the appropriate standard of review in this case, we turn to both the applicable statute and the arguments presented.

¶ 58 Under section 603.10(a), restricting parental responsibilities is a two-step process. The trial court must first make a factual determination the preponderance of the evidence demonstrates the parent has "engaged in any conduct that seriously endangered the child's mental, moral, or physical health or that significantly impaired the child's emotional development." 750 ILCS 5/603.10(a) (West 2016). If the court finds the evidence presented is sufficient to make such a

determination, it must then enter orders necessary to protect the child. *Id.* In doing so, the court must exercise its discretion in selecting appropriate restrictions to parenting responsibilities to provide for the child's safety and welfare. See *id.* § 603.10(a)(1)-(a)(9).

¶ 59 James's argument on appeal relates to the trial court's factual determination the evidence was sufficient for it to conclude his conduct placed a significant emotional and mental toll on the children. We find the manifest weight of the evidence standard of review is the appropriate standard of review to apply when considering such an argument. See *Best v. Best*, 223 Ill. 2d 342, 348-49, 860 N.E.2d 240, 244 (2006) ("When a trial court makes a finding by a preponderance of the evidence, this court will reverse that finding only if it is against the manifest weight of the evidence."). A court's factual determination will be found to be against the manifest weight of the evidence if, upon review of the entire record, the opposite conclusion is clearly evident. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064, 859 N.E.2d 123, 135 (2006).

¶ 60 The evidence showed James responded to heated situations by using profanity, speaking poorly of the children's mother and her parenting abilities, and threatening dangerous punishment, such as having his 15-year-old daughter exit his vehicle on the ramp to the interstate and walk home. Regardless of whether defendant yelled at the children or spoke to them in a stern, disciplinary manner, the court's finding James had "an inability to control [his] anger" and responded inappropriately to heated situations was not against the manifest weight of the evidence. E.M. testified she "felt safer" during supervised visits and "that the burden wasn't always on [her] to feel, protect [J.A.M.]" Sarah described the children's demeanor after recent unsupervised visits with their father, indicating they would be "shaken" and require a few hours to settle down, E.M. would be "shut down" and "withdrawn," and J.A.M. would often cry. Based on this testimony as well as the testimony concerning the children's reactions to their father's inappropriate behavior, the court's determination James's conduct placed a significant emotional and mental toll on the children was not against the manifest weight of the evidence. That is, Sarah presented sufficient evidence whereby the court could find the serious-endangerment standard was met. In reaching this decision, we also note the record demonstrates James had a history of inappropriate behavior, which resulted in a plenary order of protection against him and a prior order of supervised visitation. While not explicitly relied upon by the court, we find James's history would have been an appropriate consideration in determining whether James's later conduct placed a significant emotional and mental toll on the children.

¶ 61 After determining James's conduct placed a significant emotional and mental toll on the children, the trial court was required to enter orders necessary to protect the children. 750 ILCS 5/603.10(a) (West 2016). In doing so, the court had to exercise its discretion in selecting appropriate restrictions to provide for the children's safety and welfare. *Id.* § 603.10(a)(1)-(a)(9). The restrictions selected by the court will not be reversed on appeal unless the court abused its discretion. See *In re Parentage of K.E.B.*, 2014 IL App (2d) 131332, ¶ 36, 14 N.E.3d 1259 (finding the trial court abused its discretion by requiring the parties agree to the time and place of visitation given the parties tumultuous history). An abuse of discretion occurs where "no reasonable person would take the view adopted by the trial court." *In re Marriage of Nelson*, 297 Ill. App. 3d 651, 658, 698 N.E.2d 1084, 1090 (1998).

¶ 62 In entering its order, the trial court selected restrictions to include supervision and a reduction in parenting time. 750 ILCS 5/603.10(a)(1), (2) (West 2016). The court declined to

order James to participate in an anger management program, concluding any such participation should instead be done at James's election. Based on the evidence presented, we find the restrictions to James's parenting time did not result from an abuse of the court's discretion.

¶ 63 While James may continue to contend his behavior is not inappropriate or harmful to the children, he must acknowledge court decisions have concluded otherwise. He is in control of his behavior and reactions to the frustration that often arises in visitations and in control of what changes he needs to make. We urge both parties to communicate with each other and to not use the children as a conduit for that communication. Without positive change, visitation may continue to be filled with conflict or dwindle, and that would damage everyone.

¶ 64                                     III. CONCLUSION

¶ 65 We affirm the trial court's judgment.

¶ 66 Affirmed.