2023 IL App (1st) 221103-U

No. 1-22-1103

Third Division
October 25, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT
_____

|  |  |  |
|---|---|---|
| *In re* MARRIAGE OF | ) | |
| | ) | |
| AMY KEIGHER, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Petitioner-Appellee, | ) | |
| | ) | No. 2019 D 330714 |
| and | ) | |
| | ) | The Honorable |
| GREG KEIGHER, | ) | Rossana Fernandez, |
| | ) | Judge Presiding. |
| Respondent-Appellant. | ) | |
| | ) | |

_____

PRESIDING JUSTICE REYES delivered the judgment of the court.
Justices D.B. Walker and R. Van Tine concurred in the judgment.

**ORDER**

¶ 1       *Held:* The circuit court's order restricting a father's parenting time is affirmed, where the court's finding that the father engaged in conduct which seriously endangered the children's health and welfare was not against the manifest weight of the evidence, and its determination that the father's parenting time should be supervised was not an abuse of discretion.

¶ 2       The instant appeal arises from an order allocating parental rights and responsibilities entered by the circuit court of Cook County in connection with the dissolution of the marriage

of petitioner Amy Keigher (Amy) and respondent Greg Keigher (Greg). In its order, the circuit court found that Greg had engaged in a pattern of behavior which "seriously endangered" their children's health and welfare and accordingly imposed restrictions on his parenting time. Greg appeals, contending that the circuit court's findings were against the manifest weight of the evidence and, therefore, the court abused its discretion by restricting his parenting time. For the reasons set forth below, we affirm.

¶ 3                                        BACKGROUND

¶ 4        Amy and Greg were married in 2004, and had four children: Ja.K. (born in 2006), J.K. (born in 2007), V.K. (born in 2011), and Jos.K. (born in 2015). Ja.K., J.K., and Jos.K., the parties' sons, had all been diagnosed with attention-deficit/hyperactivity disorder (ADHD), and V.K., the parties' daughter, has Down syndrome. In 2019, Amy filed a petition for dissolution of marriage pursuant to the Illinois Marriage and Dissolution of Marriage Act (Marriage Act) (750 ILCS 5/101 *et seq.* (West 2018)), alleging that irreconcilable differences had caused an irretrievable breakdown of the marriage. At the time of the petition, both parties lived in Elk Grove Village, Illinois, and Amy was employed as a flight attendant, while Greg was employed as a firefighter/paramedic and was an officer in the Navy reserves. During the pendency of the dissolution proceedings, Greg purchased a home in Coal City, Illinois, using marital funds, allegedly without Amy's consent.

¶ 5        In February 2020, the circuit court entered an agreed order, in which Greg was awarded parenting time with all four children for six overnights per month. In March 2020, Amy filed an emergency motion to temporarily restrict the children from leaving Illinois, claiming that Greg was planning on taking them to Florida over spring break despite the COVID-19

2

pandemic. The circuit court granted Amy's motion, ordering Greg not to remove the children from Illinois until further order of court.

¶ 6        In April 2020, Greg filed a motion requesting the appointment of a guardian *ad litem* (GAL), claiming that the parenting time schedule set by the court in February was not in the best interest of the children. The circuit court granted Greg's motion in May 2020 and appointed Miriam Cooper as the children's GAL.

¶ 7        In August 2020, the circuit court appointed Dr. David Finn as a 604.10(b) evaluator[1] for the dissolution proceedings, and also modified the parenting schedule. The modified schedule provided that the older two children (Ja.K. and J.K.) would temporarily reside with Greg, while the younger two children (V.K. and Jos.K.) would temporarily reside with Amy. Every weekend, the four children would be together, with Greg and Amy alternating weekends. The order further provided that "[n]either party shall talk to the children about anything permanent [regarding] where the children will be living or which school they will be attending on a permanent basis."

¶ 8        In September 2020, Dr. Finn submitted a report to the circuit court, in which he opined that "a serious endangerment exists that requires contact between the children and their father to be suspended" and recommended that J.K. be enrolled in a therapeutic residential school. In his report, Dr. Finn indicated that, after interviewing the parties and the children, he developed "significant concerns" about the children's well-being, which he attributed "overwhelmingly to Greg's influence." Dr. Finn noted that, as a result of Greg's influence, Amy's ability to keep

---

[1] Section 604.10(b) of the Marriage Act (750 ILCS 5/604.10(b) (West 2020)) provides that the circuit court may seek the advice of any professional to assist the court in determining the child's best interests. The court may also order an evaluation by a professional retained by one of the parties to assist the court in determining the child's best interests. *Id.* § 604.10(c).

the older boys safe was limited, "as she has been marginalized and they have no regard for her input or direction." Dr. Finn further noted that the younger children were not safe with their older brothers, pointing to a recent incident in which the older boys bound Jos.K. to a doorknob with packing tape. Dr. Finn observed that the older boys had exhibited distress and psychological issues in part due to their untreated ADHD, but Greg had undermined Amy's efforts to engage interventions to address these issues, such as medication. "Perhaps more significantly in the long term," Dr. Finn also noted that the older boys were alienated from Amy, and Greg expressed certainty that, in time, Jos.K. would be as well.

¶ 9        Dr. Finn opined that Greg was "intensely angry" with Amy, based on "unresolved grief" over the dissolution of their marriage and Greg's control issues, and this anger led to him "triangulating"[2] the children and turning them against Amy. In evaluating the children's needs, Dr. Finn opined that "[t]he children first and foremost need to be away from Greg's hostility towards Amy and the resulting triangulation they are subject to." Dr. Finn further opined that Greg's purchase of a house over Amy's objections, his intimidating behavior, and his "use" of the children were consistent with dynamics of domestic violence and, specifically, his stated regret at not being able to exercise control over Amy was "consistent with the coercive-controlling type of domestic violence." Dr. Finn concluded that "[t]his is a family in absolute crisis." Dr. Finn opined that "Greg's stunning lack of insight and failure at any shred of accountability puts the children at serious risk," noting that "[h]e looks the other way and makes excuses for his sons' misbehavior even while Amy attempts to pursue treatments for conditions that have been identified." For instance, Dr. Finn pointed to an incident in which

---

[2] In the context of family therapy, "triangulation" is "a situation in which two members of a family in conflict each attempt to draw another member to their side," such as where two parents are in conflict and the child is caught in the middle. "Triangulation," American Psychological Association, *APA Dictionary of Psychology*, https://dictionary.apa.org/triangulation (last accessed Oct. 10, 2023).

the older boys zip-tied a cousin who had autism, pointed an airsoft gun at his head, and threatened to kill him if he moved; while Dr. Finn noted that this incident "sounds absolutely traumatic for that child," Greg denied his sons' culpability. Dr. Finn recommended, *inter alia*, that Greg's parenting time be limited to professionally supervised visits, that Amy be awarded sole decisionmaking responsibility for the children, and that Amy be allowed to enroll J.K. in a therapeutic boarding school.

¶ 10        In September 2020, the circuit court entered an order based on review of Dr. Finn's report, finding that the report raised "issues of serious endangerment which must be addressed immediately by means of this temporary Order." The court ordered the parties to enroll J.K. in a therapeutic boarding school immediately and further ordered that "[t]hey shall not discuss with him any part of this litigation, the divorce, [or] the Report for enrolling him in this temporary placement." The court also ordered Ja.K. returned to Amy's care, where he was to continue in therapy. The court's order further provided that Greg was to attend counseling until the therapist recommended that Greg was ready to have supervised parenting, at which point Greg was permitted to have supervised parenting time, provided that it included no watercraft and took place within 10 miles of Amy's residence. The order expressly provided that Greg "shall have no contact with the children via telephone, social media, text, email, or video games until [the therapist] and GAL believe it is appropriate." Finally, the order provided that Amy was to have all decisionmaking responsibilities regarding all four children until further order of the court.

¶ 11        In November 2020, the GAL reported that certain of Greg's family members had written a letter "urging [Greg's] family and friends to improperly contact [Amy] to pressure her and improperly influence her in the immediate pending matter." The circuit court ordered Greg to

immediately instruct his family and friends not to contact Amy in any manner, and further ordered him to instruct them not to communicate any matters related to the case to any of the children.

¶ 12    In December 2020, Greg requested leave to retain a 604.10(c) expert, which the circuit court granted.

¶ 13    In February 2021, the circuit court entered an order providing that Greg was to commence supervised parenting time as recommended by his therapist and the GAL. In July 2021, Amy filed a petition for a finding of indirect criminal contempt based on Greg's violation of the circuit court's orders regarding communication with the children. Amy alleged that, contrary to the terms of the court's orders, Greg had ceased participating in supervised parenting time and instead had improperly directly communicated with Ja.K. and J.K., the two oldest children, via text and other electronic means, including instructing them to lie to Amy, arranging for unsupervised parenting time, and instructing them to have the two youngest children view some of Greg's communications. Amy further alleged that Greg had continued to discuss the dissolution action, including the rulings of the court, the cost of the litigation, and the GAL's involvement, with Ja.K. and J.K. Attached to her petition were images of text conversations and phone calls between the children and Greg, which were listed in the children's phones under the name "Aiden K."

¶ 14    In July 2021, Dr. Robert Shapiro, Greg's 604.10(c) expert, submitted a report to the circuit court. In his report, Dr. Shapiro indicated that he had arrived at many of the same conclusions as Dr. Finn concerning the older children's alienation from Amy, but had "somewhat different" recommendations than in Dr. Finn's report. Dr. Shapiro noted that, since the issuance of Dr.

Finn's report, J.K. was sent to Pinnacle Point Behavioral Health Care System (Pinnacle), a residential treatment facility, for several months, after which Ja.K. attended for two months.

¶ 15     Dr. Shapiro identified the "overwhelming dilemma" as relating to "Greg's willingness to 'tell it like it is,' " meaning his "open critique (as he sees it) of what has gone on in the family including his disappointment with the children's mother." This resulted in the children blaming Amy for the dissolution of the parties' marriage, for "kicking dad out of the house," and for sending them to Pinnacle. Dr. Shapiro observed that "[w]ithout a doubt," the older children did not have the same level of respect for Amy as they did for Greg and, as a result, "they challenge their mother's direction and decisions in a way they would never consider doing with their father." Dr. Shapiro noted that Greg's response of " 'boys will be boys' " was a "passive aggressive way of supporting the children's disrespect," and it was this type of response which Dr. Finn found so disturbing. Dr. Shapiro opined, however, that these family dynamics did not appear solely due to the dissolution of the parties' marriage but had been in place for years, so "[i]n this regard it is not the typical parent alienation that emerges with parental divorce."

¶ 16     Dr. Shapiro agreed with Dr. Finn's assessment that Greg's behavior fit the "coercive-controlling type of domestic violence," and further agreed that Amy had been marginalized as a parent. He opined, however, that sending the older boys to Pinnacle would not resolve their issues, since the boys had lived their entire lives with these family dynamics. Instead, Dr. Shapiro suggested that the emphasis now needed to shift to the older boys "maximizing the educational opportunities in front of them (the next three or four years of high school), thereby preparing them for adult life." He opined that the best way to do this was to have them live with Greg, who would "easily get the boys to refocus and prioritize their performance at school." Dr. Shapiro believed that if the children thought that their parents had made this

7

decision together, they could begin to heal their relationship with Amy, who could focus on "having fun, supporting their activities, and supporting their time with friends." The younger children, however, should remain with Amy, based on their ages and their continuing need for nurturing, which was Amy's strong suit.

¶ 17    In February 2022, Greg filed a petition to modify the parenting schedule, seeking unsupervised parenting time with the children. In April 2022, the circuit court entered an agreed order allocating primary parenting time of Ja.K. to Greg, with Amy having parenting time every other weekend. However, the court's order specifically enjoined Greg from having communication with the other three children through Ja.K. or any other third party or method.

¶ 18    The trial on Amy's petition for dissolution of marriage occurred over 12 court dates in April and May 2022. As relevant to the issues on appeal, the evidence presented at trial included the following. Amy testified that all four children attended therapy, and that V.K. and Jos.K. had especially benefitted from the sessions, as their relationship had become more loving, both with each other and with her. Prior to therapy, Jos.K. had several behavioral problems, such as punching others, which Amy testified stemmed from his observing his older brothers. With respect to the older two boys, Amy testified that she was concerned due to their verbal and physical behavior. For instance, J.K., the second-oldest child, once taped Jos.K. to a doorknob while Amy was away at the grocery store, and Amy had observed J.K. and Ja.K. pulling each other's hair and choking each other. During one such instance, Amy called the police, as she was afraid to physically separate the two since they were larger than she was. On another occasion, J.K. and Ja.K. had pulled their pants down and were dancing around in front of Amy, displaying their genitals, and Ja.K. later went into Amy's room, "tearing [it]

8

apart" looking for his cell phone, which she had taken from him; Amy ended up calling the police, and J.K. and Ja.K. laughed at the police.

¶ 19    Amy testified that both Ja.K. and J.K. had been diagnosed with ADHD and had been prescribed medication; Amy wanted to begin the children on medication but Greg did not, saying "he would never allow his boys to be on ADHD medicine because it was like cocaine." Ja.K. and J.K. refused to take their medication, which Amy believed reflected Greg's beliefs, so the children were currently unmedicated. Amy further testified that Ja.K. and J.K. were also diagnosed with oppositional defiance disorder.

¶ 20    Amy testified that Greg continued to visit the Elk Grove Village home even after exclusive possession of the home was awarded to Amy, including mowing the lawn. On one occasion, Amy returned home to discover that Ja.K. and J.K. had climbed onto the roof in order to enter the home through a window and open the door for Greg.

¶ 21    Amy testified that she believed that it was in the children's best interest that she have full decisionmaking responsibility for their health and education. She further testified, however, that she believed it would be in the children's best interest for the younger children to live with her, while, as to the older children, "[u]nfortunately, *** Greg's the best option, but I don't know too many other options other than sending them away to some kind of boarding school or something." Amy later testified that it would be her preference that they attend boarding school rather than live with Greg. Amy believed that it would be in the children's best interest for the older children and the younger children to be separated, as "I would like my older children to get to the point where they would respect women, respect authority, be able to hold down a job, and I don't think they're a good example for the younger children."

¶ 22          Greg testified that he had been opposed to J.K. being sent to Pinnacle. Greg further testified that he did not believe that he needed therapy. Greg admitted that, despite the order granting Amy exclusive possession of the Elk Grove Village residence, he had visited the premises several times and further admitted that, despite the court order restricting his communication with the children, he had sent them text messages and videos, and had "[run] into" J.K. and Ja.K. at least 10 times at Buffalo Wild Wings and other Elk Grove Village restaurants. Greg testified that he "[a]bsolutely" did not think there was a problem with the children having airsoft guns, and further testified that he did not believe the children should be vaccinated for COVID-19 or medicated for their ADHD. Greg admitted that it was "possible" that he told the children Amy was "crazy" on multiple occasions, as well as telling them that she was "no fun and does not want to do anything they want to do." Greg further admitted that it was "possible" that he told the children that "it was their mother's fault[ ] that the family was breaking up and that they couldn't move to Coal City" and told them "they needed to pray for their mother that she comes to the right state of mind and moves to Coal [C]ity." When asked whether he conveyed to his children that "Amy's decisions are wrong, crazy, and, in your opinion, of no value," Greg responded "[s]ome of them are," and that it was "possible" that he conveyed that to the children.

¶ 23          Greg testified that he believed it was in the children's best interest to stay together and that they should live with him, as he could "provide a better successful outcome for them" and had a flexible work schedule and family support system nearby. Greg also testified that he believed Dr. Shapiro's report "left out a major factor" by failing to consider the fact that Amy had informed the children that she was filing a petition for dissolution of marriage before she had

spoken to Greg, which caused a "domino effect" that led to oppositional behavior from the older children.

¶ 24    Dr. David Finn, the court's 604.10(b) expert, testified consistently with the report previously submitted to the circuit court. Dr. Finn testified that, in the course of his evaluation, one of the items he found significant was the fact that Greg had a consistent "theme" in his statements, which was his anger towards Amy and his blaming her for the dissolution of their marriage, and that this theme was reflected in statements made by the children. Dr. Finn further testified that, as a result of his evaluation, he had "significant concerns about the well being of the minor children." He noted the "almost complete estrangement" between Amy and the older children, which resulted in her inability to parent them. Dr. Finn feared that this posed a safety risk to the children, and was concerned that "this was a direct result of Greg's influence in triangulating the boys and causing them to marginalize and have no respect for Amy's input." Dr. Finn was also concerned about the fact that "Greg really exposed the boys to some very damaging information about Amy and about the litigation process," including writing child support checks in front of the children and making comments about how he "pa[id] the mortgage around here." Greg also "looked the other way with some very serious behavior problems with the boys," including an incident where they tied up and threatened to kill a cousin who had autism and another incident in which they tied Jos.K. to a doorknob. The older boys also bullied Jos.K. about being in dance classes, but Greg was "dismissive" of the bullying. Greg was also dismissive of the counseling the children were engaged in and of the medication they were prescribed. Dr. Finn testified that he was "very concerned about the effect that Greg's parenting was having not just because of one or two isolated incidents but

really across the board that was resulting in *** the two older boys [having] some serious dysfunction."

¶ 25    Dr. Robert Shapiro, Greg's 604.10(c) expert, also testified consistently with the report he previously submitted to the circuit court. Dr. Shapiro testified that he believed there was parental alienation in this case, but not the way it was normally thought of, namely, something which emerged during the deterioration of the marriage. Instead, Greg and Amy "set up a family dynamic system with the birth of their children, and they both basically conspired to carry that system forward for all of these years of their marriage." As part of that dynamic, Greg was "directive, opinionated, stubborn," while Amy was "compliant, submissive, goes along with things until she can't stand it anymore." Dr. Shapiro testified that Greg was the "preferred parent," and this family dynamic "kind of setup [*sic*] the parent alienation that then exploded when Amy would not go along with Greg's directions or just, obviously, her choices." Thus, while the parental alienation began to occur at the time of the dissolution of the marriage, "all the seeds for that were set when these kids were born."

¶ 26    Dr. Shapiro testified that there were "relatively isolated incidents" where Amy had engaged in conduct out of frustration such as striking Greg, threatening to run her vehicle into a tree, or threatening to send the children back to Pinnacle if they continued to misbehave. Dr. Shapiro also testified that Greg had declined to exercise his parenting time with the children, since he disagreed with the need for supervision, and that he had not visited with them in 10 months at the time of Dr. Shapiro's evaluation.

¶ 27    Dr. Shapiro's recommendation was that the children be separated, with the older two children living with Greg and the younger two children living with Amy. While he agreed that such a recommendation was relatively rare, Dr. Shapiro opined that it was appropriate in this

case. V.K. and Jos.K. needed Amy's care, as "[s]he's a more nurturing parent; she's more empathic; she's more gentle, tender, [and] will teach those kind of personality concerns to both" children. Ja.K. and J.K., by contrast, "were outside of Amy's control," and she could not make them attend school, do schoolwork, or act respectfully towards her or others. Dr. Shapiro testified that their conduct was "sabotaging their own future" due to their failure to understand the long-term consequences of their behavior, and recommended that they live with Greg, who would ensure that they attended school and did their schoolwork. Greg would also "ensure that their behavior in school is appropriate and, thereby, interfere with the marginalization of their education that was occurring at the time that I did the evaluation." Dr. Shapiro did not recommend that all four children live with Greg, as the older boys were a negative influence on Jos.K. and he needed Amy's nurturing influence. He also recommended counseling for both parents, and suggested that instead of focusing on the concept of parental alienation with Greg, a better approach would be giving guidance on "what to do, not to do, what to say, what not to say."

¶ 28    Pamela Rak, a licensed clinical social worker who was responsible for supervising Greg's visits with the children, testified that she supervised two visits in April 2021. After the second visit, she contacted the GAL and reported that she was becoming concerned that the conversations between Greg and J.K. were becoming negative towards Amy. Greg did not contact her again to schedule a visit until September, informing her that he did not have the money for her services as "he was saving his money for trial." Rak then supervised six additional visits between October 2021 and January 2022; J.K. and Ja.K. did not attend all visits. Rak supervised one additional visit with V.K. and Jos.K, in March 2022, after which Greg indicated that her services were no longer needed. Rak testified that she did not step in

to redirect Greg during any of the visits, and only redirected the children if they were becoming too rambunctious.

¶ 29   Miriam Cooper, the children's GAL, testified that she initially believed that splitting up the older and younger children temporarily would help, as she was concerned about the younger children taking on the behavior of the older ones, but it ultimately was not successful. She testified that she now believed that the best interest of the children required the older boys to be "away at school," as she did not believe they would otherwise receive the help they needed psychologically. As to the younger children, she believed that they should live with Amy and have supervised parenting time with Greg; she did not think that they should spend time with Greg unsupervised "[b]ecause I don't know how to get to the root of this problem," and she did not wish for the younger children to have the same problems as the older ones.

¶ 30   On July 15, 2022, the circuit court entered an order with respect to the child-related matters involved in the petition for dissolution of marriage. In its order, the court expressly discussed each of the factors set forth in sections 602.5 and 602.7 of the Marriage Act (750 ILCS 5/602.5, 602.7 (West 2020)), before concluding that the best interests of the children required that Amy be awarded sole decisionmaking responsibilities for the education, medical, religion, and extracurricular activities of the children. In its discussion of several of the factors, the court expressed its concern over Greg's level of influence over the older two children and the manner in which they treated Amy. The court further observed that while Amy appeared willing to cooperate with Greg in taking his opinions into account with respect to parenting, the converse was not true, with Greg being unwilling to consider Amy's opinions.

¶ 31   The court noted that each parent had a different parenting style, which had varying benefits for the children. With respect to Ja.K. and J.K., the two older children, both had been diagnosed

14

with ADHD and oppositional defiant disorder, which required intervention before they were fully grown. The court noted that it was "very concerned with the proper development of these two young boys." With respect to V.K., the court noted that, due to her Down syndrome, she required continued intervention to keep her at a high functioning level. Finally, with respect to Jos.K, the youngest child, the court noted that he also exhibited many signs of ADHD and could also require interventions for the condition. The court found that "[i]t is very clear that all four children have unique and demanding needs. Importantly, the children need a stable home free from hostility, violence and negativity."

¶ 32     In considering whether a restriction on decisionmaking was appropriate, the circuit court noted that Dr. Finn had opined that Greg posed serious endangerment to the children with respect to decisionmaking, based on (1) Greg's decision to purchase the Coal City home "with a complete disregard for [Amy's] wishes and numerous objections" and (2) Greg's refusal to allow the older children to be appropriately treated for ADHD. The circuit court, however, noted a third, "equally concerning" incident in which Ja.K. and J.K. zip-tied a developmentally challenged cousin, "with complete disregard of the seriousness of their actions." The circuit court found that "[t]hese incidents are glaring examples of inappropriate and dangerous behaviors which are escalating outside of the home without proper intervention." The court further observed that Drs. Finn and Shapiro agreed that Greg's alienation of the older two children from their mother "contributes to a complete disregard, defiant and disrespectful behavior towards their mother (and teachers)."

¶ 33     The circuit court found that Amy recognized the importance of having both parents involved in the children's lives and that she would be able to foster a positive relationship between Greg and the children. As to Greg, however, the court found that "[t]he record reveals

15

unending examples of [Greg's] inability to foster a positive relationship between [Amy] and her children." The court found "of particular concern" Greg's statement to Dr. Finn that the older children would not speak to or visit Amy after they turned 18. The court noted that "[t]his did not appear to concern [Greg]. Moreover, the inability to intervene or properly discipline the older children for their behavior towards their mother is greatly concerning and disturbing."

¶ 34    The court found that Amy had made numerous efforts to place the children's needs above her own, but that was not the case with Greg. While Greg was active in coaching and extracurricular activities, the court found that it was not convinced that Greg would place the needs of the children above his own. The court found: "Regrettably, [Greg] ignored months of court ordered, supervised parenting time with the children, he failed to take counseling sessions seriously, and failed to consider the consequences of his own behaviors upon the minor children, including inappropriate discussions about the pending divorce." The court further noted, "the court is concerned about the failure to address the numerous medical issues his children suffer. The court is greatly distraught at the thought that the needs of the minor children will continue to be ignored."

¶ 35    Additionally, the circuit court entered an allocation of parental responsibilities judgment and parenting plan. In the judgment, the court allocated sole care and decisionmaking responsibility to Amy. In addition, the court found that, "after considering the parties' current employment and living situations, conduct of [Greg] to alienate the children from their mother and failure to comply with the Court's orders regarding supervised parenting time and continued attempts to contact the children in violation of this Court's orders and after consideration of all other relevant factors," it was in the best interests of the children that Amy

be designated as the parent with the majority of parenting time and that all parenting time between Greg and the children be restricted until further order of the court.

¶ 36        With respect to parenting time, the circuit court found that Greg "has engaged in a pattern of behavior which has seriously endangered the parties' children's mental, [and] moral health and which has significantly impaired the children's emotional development." The court accordingly placed the following restrictions on Greg's parenting time. First, Greg was to have supervised parenting time with each child at least 18 times within 6 months. Following the successful completion of the supervised parenting time, Greg was to have unsupervised parenting time once a week for a period of four months, in addition to supervised parenting time every other week. Once Greg successfully completed that stage, he would be entitled to unsupervised parenting time with the children on alternating weekends for six months, after which the parenting schedule would be reevaluated. As a condition to Greg exercising his parenting time, he was required to continue attending counseling on a biweekly basis or as recommended by the counselor, and was enjoined from "speaking about AMY, members of her household, friends and or [*sic*] family or their decisions, actions or inactions in a derogatory uncomplimentary or critical fashion."

¶ 37        Greg timely filed a notice of appeal, and this appeal follows. We note that Illinois Supreme Court Rule 311(a)(5) (eff. July 1, 2018) requires a ruling on an appeal involving a case allocating parental responsibilities within 150 days of the filing of the notice of appeal, unless good cause is shown to extend the deadline. In this case, there were multiple extensions of time requested by the parties for the filing of the record on appeal and the briefs, so we find good cause to issue our decision outside the 150-day timeframe.

17

¶ 38                                          ANALYSIS

¶ 39          On appeal, Greg contends that the circuit court erred in finding that Greg seriously

endangered the children and, therefore, his parenting time should not have been restricted. If a

circuit court finds that "a parent engaged in any conduct that seriously endangered the child's

mental, moral, or physical health or that significantly impaired the child's emotional

development," the court may enter orders "as necessary to protect the child," including

restrictions on the parent's parenting time. 750 ILCS 5/603.10(a) (West 2022). Thus,

restricting parental responsibilities is a two-step process, requiring the circuit court to first

make a factual determination that the parent's conduct seriously endangered the child, then

exercising its discretion to select an appropriate restriction. See *id.*; *In re Marriage of Mayes*,

2018 IL App (4th) 180149, ¶ 58. A circuit court's factual determination will be upheld unless

it is against the manifest weight of the evidence, meaning that "upon review of the entire

record, the opposite conclusion is clearly evident." *In re Marriage of Mayes*, 2018 IL App

(4th) 180149, ¶ 59; *In re Marriage of Palarz*, 2022 IL App (1st) 210618, ¶ 28. Moreover, in

determining whether a judgment is against the manifest weight of the evidence, the reviewing

court views the evidence in the light most favorable to the appellee and, " '[w]here the evidence

permits multiple reasonable inferences, the reviewing court will accept those inferences that

support the court's order.' " *In re Marriage of Palarz*, 2022 IL App (1st) 210618, ¶ 28 (quoting

*In re Marriage of Bates*, 212 Ill. 2d 489, 516 (2004)).

¶ 40          In this case, Greg argues that the circuit court's decision was against the manifest weight

of the evidence where it misrepresented Dr. Shapiro's testimony and ignored the "admitted

acts of domestic violence" perpetrated by Amy against Greg. With respect to Dr. Shapiro's

testimony, Greg points to a sentence in the circuit court's order in which the court found that

"Dr. Finn and Dr. Shapiro agree that *** [Greg's] alienation of the two older children from their mother contributes to a complete disregard, defiant and disrespectful behavior towards their mother (and teachers)." Greg claims that Dr. Shapiro never said such a thing, but instead opined that the family dynamics leading to the children's alienation began well before the dissolution proceedings and were contributed to by both parties. Greg fails to recognize, however, that both statements may be true: Dr. Shapiro did, in fact, opine that Greg bore some responsibility for the alienation of the children from Amy, while also observing that the alienation was an outgrowth of the family dynamic which had existed since the birth of the children.

¶ 41     Even if the alienation had its roots in preexisting family dynamics, however, this does not absolve Greg from his role in encouraging it. Indeed, Dr. Shapiro identified the "overwhelming dilemma" as relating to "Greg's willingness to 'tell it like it is,' " meaning his "open critique (as he sees it) of what has gone on in the family including his disappointment with the children's mother." According to Dr. Shapiro, Greg's conduct resulted in the children blaming their mother for the dissolution of the parties' marriage and Greg "passive aggressive[ly]" supported the children's disrespect by dismissing it as " 'boys will be boys.' " There is plentiful support for this opinion in the record on appeal, including examples of Greg undermining Amy's authority, criticizing her decisions in the presence of the children, and outright defying restrictions on his interactions with the children. We therefore cannot find that the circuit court erred in relying on Dr. Shapiro's opinion in finding that Greg's conduct seriously endangered the children.

¶ 42     Similarly, we find unpersuasive Greg's claim that the circuit court "ignore[d]" Amy's conduct in making its findings. First, we note that the question before us is whether there is

19

support for the court's finding that *Greg's* conduct seriously endangered the children's welfare, not whether *Amy's* conduct did so; a finding that Amy's conduct was also inappropriate would have little bearing on the question of whether Greg engaged in improper conduct. Moreover, the record shows that the circuit court was well aware of the facts Greg points to in his brief, namely, Amy's cursing, slapping Greg on at least one occasion, and threatening to kill herself by driving their vehicle into a tree. Indeed, both Dr. Finn and Dr. Shapiro noted Amy's shortcomings in their reports, but concluded that there was no pattern of physical violence during the parties' marriage such that it posed a concern. Both doctors also observed that Amy was well aware of her flaws and sought to address them, whereas Greg appeared not to acknowledge that his conduct could in any way be problematic. The circuit court also expressly addressed these incidents in its order, finding that Amy's behavior did not rise to the level of physical violence or demonstrate a pattern of behavior during the marriage. We therefore cannot find that the circuit court overlooked Amy's conduct in making its findings, and cannot find that it was against the manifest weight of the evidence for the court to conclude that Greg's conduct seriously endangered the children's health and welfare.

¶ 43    Once the circuit court determined that Greg's conduct seriously endangered the children's health and welfare, the court was entitled to enter orders "as necessary to protect the child[ren]," including restrictions on Greg's parenting time. 750 ILCS 5/603.10(a) (West 2022). The restrictions selected by the circuit court will not be reversed absent an abuse of discretion. *In re Marriage of Mayes*, 2018 IL App (4th) 180149, ¶ 61. "An abuse of discretion occurs where 'no reasonable person would take the view adopted by the trial court.' " *Id.* (quoting *In re Marriage of Nelson*, 297 Ill. App. 3d 651, 658 (1998)). Here, the court determined that the proper restrictions included a requirement that Greg's parenting time be

supervised, with the restrictions progressively lessened as he demonstrated that he could spend time with the children in an appropriate manner. Given the evidence in the record on appeal as to his prior conduct, we cannot find that the circuit court abused its discretion in imposing such a restriction. Accordingly, we affirm the circuit court's judgment in its entirety.

¶ 44                                    CONCLUSION

¶ 45        For the reasons set forth above, we affirm the judgment of the circuit court. The court's finding that Greg's conduct seriously endangered the children's health and welfare was not against the manifest weight of the evidence, and it did not abuse its discretion in finding that a restriction on Greg's parenting time was appropriate.

¶ 46        Affirmed.