**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2026 IL App (3d) 250540-U

Order filed May 7, 2026

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2026

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| | ) | of the 18th Judicial Circuit, |
| JOSEPH M.M., | ) | Du Page County, Illinois, |
| | ) | |
| Petitioner-Appellant | ) | |
| | ) | Appeal No. 3-25-0540 |
| | ) | Circuit No. 22-DC-147 |
| and | ) | |
| | ) | |
| DAHLIA M., | ) | Honorable |
| | ) | James F. McCluskey, |
| Respondent-Appellee. | ) | Judge, Presiding. |

_____

JUSTICE BRENNAN delivered the judgment of the court.
Presiding Justice Hettel and Justice Anderson concurred in the judgment.

_____

**ORDER**

¶ 1      *Held*:   We affirm the trial court's orders as to parenting time and decision-making responsibility for the parties' minor children.

¶ 2      Petitioner, Joseph M.M., appeals from the trial court's orders restricting his parenting time and awarding sole decision-making responsibility for the parties' minor children to respondent, Dahlia M. For the following reasons, we affirm.

¶ 3                             I. BACKGROUND

¶ 4       Joseph and Dahlia were married in 2011 and have two minor children, M.M. and N.M., (born in 2014 and 2015). In 2019, Joseph filed a petition for dissolution of marriage in the circuit court of Washington County, Tennessee. The Tennessee circuit court entered a judgment for dissolution of marriage on August 4, 2020, which incorporated a July 15, 2020, parenting plan. Thereafter, Joseph moved to Illinois with the children, and Dahlia moved to Michigan. The plan allocated parenting time primarily to Joseph. In addition, Joseph was awarded sole decision-making responsibility regarding the children's education and extracurricular activities, and the parties were awarded joint decision-making responsibility regarding the children's religious upbringing and nonemergency healthcare. Subsequently, however, on November 1, 2021, Joseph was awarded sole decision-making authority regarding the children's nonemergency healthcare. In September 2022, Dahlia moved to Illinois, less than 10 miles from Joseph and the children. The Tennessee judgment was thereafter enrolled in the circuit court of Du Page County. Extensive litigation regarding parenting time and decision-making responsibility ensued, as summarized in relevant part below. In addition, throughout the course of the litigation, the trial court appointed the following individuals: (1) Angel Traub as the guardian *ad litem* (GAL) for the children to address parenting time and decision-making issues; (2) Robert Shapiro as the court's child custody evaluator to make recommendations to the court concerning parenting time and decision-making responsibility (see 750 ILCS 5/604.10(b) (West 2024)); (3) Mark L. Goldstein as Joseph's retained child custody evaluator (see *id.* § 604.10(c)); and (4) Maureen Tamillow as the family therapist.

¶ 5                           A. Pretrial Proceedings

¶ 6       On April 6, 2023, Joseph filed a petition for restriction of Dahlia's parenting time and to modify the parenting schedule but withdrew the petition on November 14, 2024. Thereafter,

Dahlia filed a petition to modify the parenting schedule seeking the majority of parenting time and sole decision-making responsibility (and a subsequent amended petition to conform with the proofs at trial) and petitions to limit or restrict Joseph's parenting time (including emergency petitions). Meanwhile, Shapiro submitted his written report on April 25, 2024 (updated on September 11, 2024), recommending, *inter alia*, that the children's best interests would be served by awarding Dahlia the majority of parenting time, subject to alternating weekends and Tuesday afternoons with Joseph and an equal rotation for the summer and holidays. Shapiro also recommended that Dahlia have sole decision-making responsibility as to the children's healthcare, education, religion, and extracurricular activities.

¶ 7        The trial court held a hearing on Dahlia's petitions on August 5, 2024, at which the parties and the GAL testified. The GAL recounted that she had met twice with each party and had reviewed hundreds of their e-mails. She also spoke with Tamillow, the children's former counselor, and a school counselor. The GAL testified that it was in the children's best interests to reside primarily with Dahlia, noting concerns about lack of supervision during the work hours of Joseph's parenting time. The GAL also stated that the children's conduct had improved while in Dahlia's sole care for the prior six weeks of summer parenting time. On August 7, 2024, the trial court entered a temporary order without prejudice pursuant to which Dahlia was granted the majority of parenting time and Joseph was granted parenting time with the children on alternating weekends. The trial court noted the GAL's testimony and stated that the children's behavior would continue to be monitored until trial.

¶ 8        On September 11, 2024, Goldstein submitted his written report, recommending that parenting time be divided equally and that, with respect to decision-making responsibility, responsibility as to the children's religion and healthcare be made jointly, Dahlia have sole

3

decision-making responsibility as to the children's education, and that Joseph have sole decision-making responsibility as to the children's extracurricular activities.

¶ 9     The GAL issued her written report on October 24, 2024. As to parenting time, the GAL recommended that Dahlia have the majority of parenting time subject to Joseph's parenting time on alternating weekends, alternating holidays, and two nonconsecutive weeks in the summer. She further recommended that Joseph personally monitor the children's behavior and place parental controls on their electronic devices. Moreover, the GAL recommended that Dahlia be awarded sole decision-making responsibility in all four areas. In making her recommendations, the GAL noted her consideration of the relevant statutory factors and that she reached many of the same conclusions, but not all of the same recommendations as Shapiro in his court-ordered evaluation report. The GAL elaborated, "When I first met the boys, a little less than two years ago, they were happy, energetic, had boundaries and were age appropriate. They are not any longer. These boys are manipulative, calculating, secretive, aggressive and inappropriately verbal and physical. They even use sexual terminology that most adults would not even use."

¶ 10    The GAL issued an updated written report on January 24, 2025 (subsequent to her trial testimony described below), recommending that Joseph's parenting time be supervised until he participated in an extensive parenting course and until M.M. underwent a neuropsychological evaluation. The GAL opined that Joseph was promoting the children's misconduct, enticing them with gifts and unsupervised screen time, and encouraging them to raise allegations against Dahlia to gain a favorable outcome in the litigation. The GAL further opined that Joseph disregarded the need for mental health intervention for M.M.

¶ 11                                B. Trial

4

¶ 12       Trial on Dahlia's petitions involving the allocation of parenting time and decision-making responsibilities commenced on November 12, 2024, and continued over the course of multiple nonconsecutive trial days, ending on May 20, 2025. The witnesses included the parties, the GAL, Tamillow (the family counselor), and Cindy Suo (a crisis services counselor at the Du Page County Health Department). The reports of Traub, Shapiro, and Goldstein were admitted into evidence.

¶ 13       Dahlia testified that, during the summer and fall of 2024, the children's conduct was polite and calm during her parenting time, would become extremely erratic and hostile when the children returned after Joseph's parenting time, and would subside after the children were with Dahlia for a few days. Dahlia testified that this pattern of conduct intensified in the last three months of 2024. Dahlia recorded videos of M.M. on October 17, 2024, and October 22, 2024, and described that the videos showed M.M. screaming, swearing, hitting, and attempting to pull a knife on her. Dahlia testified that the conduct began on Sunday, October 13, 2024, after a weekend with Joseph and ultimately culminated in her decision to visit the Du Page County Crisis Center on November 10, 2024.

¶ 14       The crisis services counselor, Cindy Suo, testified that she interviewed M.M., Dahlia, and Dahlia's mother on November 10, 2024. M.M. told the service counselor that Dahlia slapped, pushed, and choked him. Cindy Suo reported the allegation to the Department of Children and Family Services (DCFS), which determined the report to be unfounded. Suo further testified that M.M. presented as threatening and homicidal with a diagnosis of unspecified reaction to severe stress. She recommended, *inter alia*, partial hospitalization for M.M. to learn coping skills, although this recommendation was not implemented.

¶ 15    Joseph testified the videos of M.M. were very concerning and that the children never misbehave like that under his care. Joseph stated that he never uses offensive language in front of them and that he has never hit them. Joseph provided the videos to the children's pediatrician, who recommended a neuropsychological evaluation. Joseph testified that he adequately supervises the children as well as their screen time and access to technology and ensures that the content is age appropriate. Joseph denied "brainwashing" the children or saying anything to alienate the children from Dahlia, instructing them to lie to the GAL or evaluators about Dahlia, or conditioning the children to lie that Dahlia is physically abusive. Joseph testified that he met with Tamillow twice, once alone in early 2024 and once with the children in April 2024. He further testified that he had not refused to work with Tamillow and that he had e-mailed her in August 2024 without receiving a response. Joseph testified that the GAL inexplicably refused to communicate with him and challenged the GAL's assertion that he is causing the children to act inappropriately. Joseph acknowledged that he reported the GAL to the ARDC, reported the DCFS case worker to her supervisor, and reported two teachers and a tutor at the children's school to the principal.

¶ 16    The GAL testified regarding her extensive investigation, which included interviews of the parties, their court-appointed evaluators, three treating therapists, personnel at the children's school, case workers, DCFS employees, the children's pediatrician, and the children's maternal grandmother; and review of the court pleadings, e-mails generated by the parties, and the children's school records. Based upon her investigation and the relevant statutory factors set forth in sections 602.5 and 602.7 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/602.5, 602.7 (West 2024)), the GAL recommended that Dahlia be allocated sole decision-making responsibility with respect to the children's healthcare, education, religion, and

extracurricular activities, noting the parties' acrimonious relationship and Dahlia's ability to set this aside to place the children's needs ahead of her own.

¶ 17     In addition, the GAL expressed concern about Joseph's "lack of accountability and what seems to be lack of supervision" and "unveiled desire to have the boys treat mom in a disrespectful and abusive manner." The GAL testified, "My concerns have been heightened ***. I am worried that he [M.M.] is going to harm someone or himself." The GAL testified that, since her October 23, 2024, report, new information had been brought to her attention, namely, Joseph reported that Dahlia had choked M.M, and Dahlia and Tamillow reported that M.M. was being aggressive at Dahlia's home. While Joseph's attorney objected on grounds that this information was outside the scope of the GAL's October 23, 2024, report, the trial court responded, "Yeah. But I think it's information after the October 23 report, so I am going to allow it in because it's new information that the Court wants to hear from the GAL. So I am going to allow it." The GAL further testified that, given her concern that M.M. might be harmful to himself or others, she had asked the parties, three days before her November 9, 2024, testimony, to have M.M. evaluated. Dahlia had called "988" and brought M.M. to the Du Page Crisis Center on November 10, 2024.

¶ 18     The GAL acknowledged that her change of opinion was not in her written report, but she testified over Joseph's objection that she now recommended that Joseph's parenting time be supervised until completion of parenting classes and that Dahlia have sole decision-making responsibility as to the children's mental health. The GAL explained the basis for her revised recommendations, including a November 5, 2024, e-mail from Tamillow, which expressed concern that Joseph's parenting style lead the children toward " 'an inability to apply ethical thinking skills to problem solving.' " The GAL was also concerned about lack of supervision for

7

the children during Joseph's parenting time. The GAL characterized the consensus among the professionals whom she interviewed as being that Joseph "is very difficult." The GAL noted Joseph's "lack of accountability" and "unveiled desire to have the boys treat mom in a disrespectful and abusive manner," as reflected in the videos of M.M. acting in a manner that was "excessive and aggressive and scary." Thereafter, the trial court ordered the GAL to submit an updated report, and, following submission of the January 24, 2025, updated written report, Joseph was afforded the opportunity to cross-examine the GAL.

¶ 19    Tamillow, as the court-appointed family therapist, testified that she met with the children over 50 times. Tamillow noted concerns about unsupervised screen time and possible access to pornographic websites at Joseph's house in June 2024. Tamillow communicated primarily with Dahlia and met with Joseph once, but he declined further participation. Tamillow testified that, from November 2023 when she was appointed, to the time of the November 2024 trial date, the children's conduct had become progressively worse. Specifically, the children were rude and began to demonstrate inappropriate sexual movements as well as disrespect toward Dahlia. Tamillow acknowledged e-mail correspondence to the GAL in which she relayed that that people involved with the family thought that M.M. should be hospitalized but that it would "hurt Dahlia's chance to improve the [children's] lives if she did it prior to the case being wrapped up" and that she would not want it to hurt Dahlia's parenting opportunities.

¶ 20    On May 27, 2025, following the close of proofs and prior to submission of closing arguments, the trial court heard argument on a petition Joseph filed for the majority of summer parenting time. At that point, pursuant to the August 8, 2024, temporary parenting order, Dahlia had been granted the majority of parenting time and Joseph was granted parenting time on alternating weekends. The GAL recommended that Joseph should not have more parenting time

8

for the summer than the amount currently in effect but that it was in the children's best interests to have vacation time with both parents. On May 28, 2025, the trial court entered an order directing that each party would have three weeks of summer parenting time and that Joseph would continue to have parenting time on alternating weekends.

¶ 21                                               C. Ruling

¶ 22        On September 19, 2025, the trial court entered its nine-page written judgment, recounting at length the trial testimony and noting that it had considered and evaluated the credibility of witnesses and had considered the relevant pleadings, statutory provisions, and rules. The trial court ordered that Joseph have three hours of supervised parenting time every Sunday until "he participates in and completes an extensive parenting training program that is satisfactory to this Court." In doing so, the trial court found that Joseph's conduct had seriously endangered the children's mental health and had significantly impaired the children's emotional development. In addition, citing the GAL's reports, the trial court found:

> "The cycle of the children's behavior will not stop until a drastic measure is taken to assure an outcome that is in the best interest of the children. The cycle of having the children with the Father and then once they are returned to the mother, they lose complete control over their emotions and fail to treat their mother with any respect o[r] common decency. This cycle must stop."

¶ 23        Regarding the parties' testimony, the trial court found that Dahlia "testified in a forthright manner" and "appears to be truthful." In contrast, the trial court found Joseph's testimony "not realistic and not credible" and characterized Joseph's testimony as "stoic and rehearsed." The trial court found that Joseph takes no responsibility for the children's behavior, "paints an overall picture that he is a perfect parent," and attests to a complete unawareness of any emotional,

9

psychological, or cognitive problems with the children. Indeed, when Joseph was confronted by a video displaying M.M.'s conduct, Joseph accepted no responsibility and blamed Dahlia, the GAL, and Tamillow. The trial court also found Tamillow's testimony regarding the children's conduct to be credible.

¶ 24 In addition to the restrictions on Joseph's parenting time, the trial court awarded Dahlia sole decision-making responsibility in the areas of education, healthcare, religion, and extracurricular activities. With specific reference to the parties' ability to cooperate to make decisions, the trial court found the conflict between the parties to be extreme. The trial court elaborated:

> "A parenting plan was entered into July 2020, in Tennessee. Five years later the parents can't agree what day of the week it is. The GAL reported that the children seem to be happy and normal in 2023 but over the last 2 years they have changed to be unstable, unruly, rude, and violent with their mother after having spent parenting time with their Father. The Court has observed both parents over a 1.5-year period and through 9 months of trial. Based on the Court's observations and experience in life and the review of all experts, therapist, GAL reports and trial testimony, the Court finds that in the best interest of the children, [Dahlia] be awarded decision making authority in Education, Medical, Religion and Extracurriculars."

¶ 25 The trial court further noted that, after five years of post-dissolution litigation, "it is clear to this Court that the parties cannot work together in the best interest of the children." The trial court found that the GAL's testimony was "thorough and persuasive and withstood many hours of severe cross examination" and, having viewed her "demeanor, manner in testifying and the conviction of her recommendations," the trial court found the GAL to be credible. The trial court

10

further noted that the GAL's reports "paint a sad picture of the children's situation at the present time."

¶ 26 Accordingly, the trial court restricted Joseph's parenting time to three hours of supervised parenting time every Sunday until satisfactory completion of the parenting program and awarded Dahlia sole decision-making responsibility in the areas of education, healthcare, religion, and extracurricular activities. However, at the September 19, 2025, hearing—the day on which the trial court entered its written judgment, Dahlia's counsel inquired as to the parameters of parenting time for the upcoming weekend. The trial court responded that Joseph could continue to have his full weekend of parenting time and that it could remain unsupervised until the trial court could receive a recommendation from the GAL as to who would supervise Joseph's parenting time.

¶ 27 Joseph timely appealed.[1]

¶ 28                                    II. ANALYSIS

¶ 29 On appeal, Joseph challenges the restrictions on his parenting time and the award of sole decision-making responsibility to Dahlia. Initially, we address our jurisdiction. See *Secura Insurance Co. v. Illinois Farmers Insurance Co.*, 232 Ill. 2d 209, 213 (2009) (a reviewing court has an independent duty to consider its jurisdiction). While the record reflects the pendency of motions pertaining to child support and allocation of GAL and evaluator fees, we have jurisdiction over Joseph's appeal pursuant to Illinois Supreme Court Rule 304(b)(6) (eff. Mar. 8, 2016) ("[a] custody or allocation of parental responsibilities judgment or modification of such

---

[1] We note that, given the parties' multiple extension requests, there is good cause shown for issuing this decision beyond the deadline for deciding accelerated appeals involving child custody or allocation of parental responsibilities. See Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018); *In re Zariyah A.*, 2017 IL App (1st) 170971, ¶ 69 (finding good cause for issuing decision after deadline where there were multiple extensions of time requested by the parties, among other procedural delays).

11

judgment entered pursuant to the [Act]" is appealable without a Rule 304(a) finding). However, Dahlia argues that Joseph's challenge to the restrictions on Joseph's parenting time is moot, as the trial court has since removed the supervision requirement. Specifically, we granted Dahlia's motion to supplement the record with the transcript from a January 8, 2026, hearing, at which the parties and the GAL appeared before the trial court and advised that Joseph had completed the parenting training program. The trial court thereafter removed the supervision requirement from Joseph's parenting time. Joseph responds that, while the trial court removed the supervision requirement, the restriction of only three hours of parenting time each week remains, as does Dahlia's sole decision-making responsibility, and thus his appeal is not moot. We agree with Dahlia that any challenge to the imposition of supervised parenting time has been rendered moot by the removal of the supervision requirement. See *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 2016 IL 118129, ¶ 10 (an appeal is moot when no actual controversy exists or when events transpire that render it impossible for the reviewing court to grant effectual relief). Notwithstanding, Joseph continues to challenge the reduction of his parenting time to three hours on Sundays as well as the award of sole decision-making responsibility to Dahlia. These issues were not rendered moot by the trial court's removal of the supervision requirement, and we therefore turn to the merits of the parties' arguments on these issues.

¶ 30                                    A. Restriction on Parenting Time

¶ 31          Joseph challenges the reduction of his parenting time to three hours each week. Section 603.10(a) of the Act (750 ILCS 5/603.10(a) (West 2024)) provides that the court "shall enter orders as necessary to protect the child" if, after a hearing, the court finds by a preponderance of the evidence that a parent engaged in any conduct that seriously endangered the child's mental, moral, or physical health or that significantly impaired the child's emotional development. A

court engages in a two-step process when restricting parenting time. *In re Marriage of Mayes*, 2018 IL App (4th) 180149, ¶ 58. Initially, the court must make a factual determination as to whether the parent's conduct rose to the level of serious endangerment. *Id.*; *In re Marriage of Hipes*, 2023 IL App (1st) 230953, ¶ 43. The party seeking to restrict parenting time has the burden of proving serious endangerment. *Marriage of Hipes*, 2023 IL App (1st) 230953, ¶ 43. If the evidence presented is sufficient to make such a finding, then the court must enter orders necessary to protect the child, which may include, *inter alia*, a reduction or other adjustment to parenting time and/or decision-making responsibilities, supervised parenting time, restraints on the parent's communications with the child, or other constraints or conditions deemed necessary to ensure the child's safety and welfare. 750 ILCS 5/603.10(a) (West 2024); *Marriage of Hipes*, 2023 IL App (1st) 230953, ¶ 54.

¶ 32        On appeal, we consider whether the trial court's finding of serious endangerment is against the manifest weight of the evidence. *Marriage of Mayes*, 2018 IL App (4th) 180149, ¶ 59. A ruling is against the manifest weight of the evidence when the opposite conclusion is clearly evident. *Id.* We review the trial court's determination that certain restrictions are necessary for an abuse of discretion. *Id.* ¶ 61. A trial court abuses its discretion when its ruling is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court. *Marriage of Hipes*, 2023 IL App (1st) 230953, ¶ 54.

¶ 33        Here, the trial court explicitly found that Joseph's conduct had seriously endangered the children's mental health and had significantly impaired the children's emotional development. The trial court proceeded to find that the restrictions imposed on Joseph's parenting time were in the children's best interests. Joseph challenges these findings on grounds that the children's conduct at issue occurred after the trial court entered its August 8, 2024, temporary parenting

13

order, pursuant to which Dahlia was granted the majority of parenting time. Thus, Joseph's position is that the children's conduct should be attributable to Dahlia. Joseph further observes that the reports from Shapiro and Goldstein both included recommendations involving a greater amount of parenting time for Joseph.

¶ 34    However, the GAL and Tamillow testified specifically as to their concerns regarding Joseph's parenting style and lack of supervision and the children's conduct following their parenting time with Joseph, as well as the escalating conduct in the months leading up to trial, citing a litany of incidents. In turn, the trial court found that "[t]he cycle of having the children with the Father and then once they are returned to the mother, they lose complete control over their emotions and fail to treat their mother with any respect of common decency" had to stop. In doing so, the trial court found the GAL, Tamillow, and Dahlia credible but found Joseph's testimony "not realistic and not credible" as well as "stoic and rehearsed." Moreover, in reaching its decision, the trial court explicitly noted that it had considered all reports, which included those of Shapiro and Goldstein. Having reviewed the record, we cannot say that the trial court's finding of serious endangerment was against the manifest weight of the evidence or that the imposition of restrictions on Joseph's parenting time was an abuse of discretion.

¶ 35    Still, Joseph maintains that the trial court improperly considered the GAL's recommendations that were outside the scope of her initial report. Section 506(a)(2) of the Act (750 ILCS 5/506(a)(2) (West 2024)) provides that, in any proceedings involving, *inter alia*, custody, visitation, allocation of parental responsibilities, or the general welfare of a minor child, the trial court may appoint an attorney to serve in the capacity of a GAL and that the GAL "shall investigate the facts of the case and interview the child and the parties." The statute further provides in relevant part, "*Unless the court directs otherwise*, the [GAL] shall submit to the court

14

and the parties a written report, written recommendations, or a proposed parenting plan, in accordance with the child's best interests, not less than 30 days before a final hearing or trial." (Emphasis added.) *Id.* While the statute contemplates that the GAL will provide the written report or recommendations prior to trial, the statute also affords the trial court discretion to modify the timing requirements with the qualification "[u]nless the court directs otherwise." See *id.*

¶ 36　　　　Here, the record reflects that the trial court did not abuse its discretion in allowing the GAL to testify beyond the scope of her initial October 23, 2024, report where the testimony included the incidents involving M.M. occurring after the issuance of her initial report. The GAL explained that her concerns had been heightened and that she was worried that M.M. might harm himself or someone else. These incidents and resulting concerns led to the GAL's revised recommendations. In addition, Joseph had the opportunity to cross-examine the GAL regarding her revised recommendations following the submission of her updated report. Accordingly, we reject Joseph's argument that court improperly considered the GAL's recommendations that were outside the scope of her initial report.

¶ 37　　　　As a final matter, Joseph argues that the trial court implicitly found that no restrictions on parenting time were required when it ruled that Joseph's parenting time could remain intact for the weekend following the court's September 19, 2025, judgment, while the trial court awaited a recommendation from the GAL as to who would supervise Joseph's parenting time. To the extent this argument extends beyond the moot issue of supervised parenting time, we disagree with Joseph's characterization of the trial court's ruling. The record reflects that, following its ruling on September 19, 2025, the trial court simply found that Joseph could have his upcoming

weekend of previously scheduled parenting time while the supervision logistics were resolved. In sum, the reduction of Joseph's parenting time does not present a basis for reversal.

¶ 38                                 B. Decision-Making Responsibility

¶ 39        Joseph also challenges the award of sole decision-making responsibility to Dahlia. The trial court is required to allocate decision-making responsibilities according to the child's best interests. 750 ILCS 5/602.5(a) (West 2024). The significant issues affecting the child for which the court shall allocate decision-making responsibility include education, health, religion, and extracurricular activities. *Id.* § 602.5(b) (1-4).

¶ 40        The court shall consider all relevant factors, including the following factors enumerated in section 602.5(c) of the Act:

>        "(1) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to decision-making;
>
>        (2) the child's adjustment to his or her home, school, and community;
>
>        (3) the mental and physical health of all individuals involved;
>
>        (4) the ability of the parents to cooperate to make decisions, or the level of conflict between the parties that may affect their ability to share decision-making;
>
>        (5) the level of each parent's participation in past significant decision-making with respect to the child;
>
>        (6) any prior agreement or course of conduct between the parents relating to decision-making with respect to the child;
>
>        (7) the wishes of the parents;
>
>        (8) the child's needs;

16

(9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement;

(10) whether a restriction on decision-making is appropriate under Section 603.10;

(11) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child;

(12) the physical violence or threat of physical violence by the child's parent directed against the child;

(13) the occurrence of abuse against the child or other member of the child's household;

(14) whether one of the parents is a sex offender, and if so, the exact nature of the offense and what, if any, treatment in which the parent has successfully participated; and

(15) any other factor that the court expressly finds to be relevant." *Id.* § 602.5(c).

¶ 41 We will not disturb a trial court's ruling as to the allocation of decision-making responsibilities unless the decision is against the manifest weight of the evidence. *Jameson v. Williams*, 2020 IL App (3d) 200048, ¶ 47. There is a strong presumption in favor of the trial court's result given its superior position to evaluate the evidence and determine the children's best interests. *In re Marriage of McLean*, 2025 IL App (5th) 250094, ¶ 82.

¶ 42 Here, the trial court noted that it had observed the parties for over a year and a half and during nine months of trial and found, based on its "observations and experience in life and the review of all experts, therapist, GAL reports and trial testimony," that it was in the best interests of the children that Dahlia be awarded sole decision-making responsibility in all areas. With

specific reference to the parties' ability to cooperate to make decisions, the trial court found the conflict between the parties to be extreme and noted that, after five years of post-dissolution litigation, "it is clear to this Court that the parties cannot work together in the best interest of the children."

¶ 43    Joseph argues that the trial court failed to discuss each factor enumerated in section 602.5(c) of the Act. However, while the trial court must consider all relevant factors, it is well established that the trial court is not required to make explicit findings on each factor or refer to each factor in its ruling. See *In re Marriage of Gorr*, 2024 IL App (3d) 230412, ¶ 46. Here, in its written judgment, the trial court explicitly noted that it had considered all relevant statutory provisions in addition to the witness testimony, reports, and the GAL's recommendation. Joseph has not presented this court with any persuasive basis upon which to conclude that the trial court's decision to award sole decision-making responsibility to Dahlia was against the manifest weight of the evidence.

¶ 44                                      III. CONCLUSION

¶ 45    For the reasons stated, we affirm the judgment of the circuit court of Du Page County.

¶ 46    Affirmed.